**TENANTS FOR JUSTICE, an unincorporated association, by its president, Leon Michael, et al., Plaintiffs,**

**v.**

**Carla A. HILLS, Secretary of the United States Department of Housing and Urban Development, et al., Defendants.**

**No. 75–2359.**

United States District Court, E. D. Pennsylvania.

Sept. 15, 1975.

**390**

James S. Rothstein, Lancaster, Pa., for plaintiffs.

Robert P. Vogel, Asst. Atty. Gen. of Pa., for Commonwealth of Pa.

Thomas B. Rutter, Philadelphia, Pa., for Charles Hibbs.

W. Hall, Dept. of HUD, Jeffrey H. Simcox, Asst. U. S. Atty., for United States.

### MEMORANDUM

FULLAM, District Judge.

Plaintiffs are tenants and former tenants in a low-income housing development in Lancaster, Pennsylvania, known as Duke Manor. Funds for construction of the project were obtained through a mortgage loan insured and subsidized by the defendant HUD, pursuant to § 221(d)(3) of the National Housing Act. The original owner of the project, a non-profit corporation, defaulted, and HUD acquired ownership of the property through a foreclosure sale in 1973, at a bid price of $921,132.

As of December 17, 1974, HUD sold the project to the defendant Duke Manor Apartments, Inc. for a cash price of $335,000 ($318,250 net to HUD), and did not retain any control over the determination of the amount of rent to be charged to the tenants, substantially all of whom are persons of low or moderate income.

The new owner (hereinafter referred to as "the corporation" or "the landlord") has repeatedly increased the rent charged to the tenants, in amounts aggregating, on the average, about 37% as of July 1, 1975. The tenants organized and instituted a "rent strike," in consequence of which: (a) certain rentals have been paid into an escrow account under the control of representatives of the tenants; (b) certain of these accumulated rentals were paid over to the landlord in exchange for its agreement to reduce the amount of rent for the month of July 1975 by 25%, in settlement of a dispute concerning alleged infestation of the premises by vermin; and (c) no rental payments have been made to the landlord for the months of August or September.

The corporation threatens to evict those tenants who fail to pay the demanded rent in full. The case is now before the Court on plaintiffs' motion for a preliminary injunction to block the threatened evictions. On September 3, 1975, I issued a temporary restraining order pending hearing on plaintiffs' motion. The hearing was held on September 8 and 10, 1975.

Plaintiffs' complaint raises many issues. The principal points may be summarized as follows:

1. Plaintiffs were deprived of due process when, without notice or hearing, HUD disposed of the property in a manner which abruptly terminated its character as a low-income housing project and transferred it to the private-enterprise free market.

2. HUD violated its own regulations by failing to give adequate consideration to alternative methods of disposition which would have preserved the original status of the project.

3. HUD violated its own regulations by selling the project to a corporation which is in reality the *alter ego* of the defendant Charles C. Hibbs, who at all times pertinent to this case has been on the "debarred list" by reason of his having been earlier convicted of criminal offenses in connection with other dealings with HUD.

4. HUD violated its own regulations, and the Environmental Protection Act, by failing to prepare and file and process an environmental impact statement. .

Among other things, plaintiffs, by reason of the foregoing alleged violations, seek to set aside the conveyance to the corporation, and to have the property restored to its "public housing" status, so as to enable low-income tenants to continue to occupy the project at prices they can afford to pay.

#### I. *Jurisdiction*

■ I am satisfied that there is jurisdiction with respect to the claim against the federal defendants under 28 U.S.C. § 1337, *see Davis v. Romney,* 490 F.2d 1360, 1365–66 (3d Cir. 1974); and 28 U.S.C. § 1361, *see Langevin v. Chenango Court, Inc.,* 447 F.2d 296 (2d Cir. 1971); *Hahn v. Gottlieb,* 430 F.2d 1243, 1245 n. 1 (1st Cir. 1970). Since plaintiffs' claims against the remaining defendants arise in part under the same statutes, since the corporate defendant is the grantee in the conveyance which plaintiffs seek to set aside, and since all of the non-federal defendants are proper targets for the interim injunctive relief which plaintiffs seek in order to preserve the *status quo* pending determination of their underlying claims, I am likewise persuaded that this Court has jurisdiction over all claims asserted against all parties. Fed.R.Civ.P. 19(a); *Langevin v. Chenango Court, Inc., supra,* at 300.

#### II. *Standing*

■ On the present record, it seems clear that these plaintiffs are persons whose interest in low-cost housing is within the "zone of interests" protected by the Nation-

al Housing Act, and that they have suffered and will suffer injury in fact. Thus, the two-pronged test for standing is met in this case. *Association of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Davis v. Romney, supra,* at 1365.

#### III. *Probability of Success on the Merits*

■ At this preliminary stage, plaintiffs are not required to prove a cause of action in its entirety, but they must, as a condition precedent to consideration of the grant of injunctive relief, establish that there is a reasonable likelihood that they will be successful in proving that they are entitled to relief. And it is, of course, unnecessary for plaintiffs now to show that all of their claims are meritorious, so long as they can show a reasonable likelihood of success on one or more of their claims.

On the basis of the record to date, I believe plaintiffs have met their burden with respect to HUD's failure to give adequate consideration to alternate methods of disposition of the project in a manner more clearly consistent with the aims and objectives of national housing policy. Undoubtedly, HUD had the right, in its discretion, to sell the project for cash, with no strings attached, if HUD concluded that disposition to a buyer or buyers who would continue to operate the property as a low-income housing project was not feasible. And even an erroneous judgment on that subject would probably be beyond the reach of judicial review. The difficulty in the present case, however, is that HUD appears to have reached its decision on a virtually irrational basis.

The record discloses that the decision was reached as follows: HUD concluded that it was not necessary to notify the tenants of the proposed sale, or to offer them an opportunity to form a cooperative, or to interest some non-profit corporation in acquiring the property, on the assumption that the capital investment required would be in the neighborhood of $900,000. This would result in a per unit price of around $12,000,

obviously far beyond the means of the tenants. But when the property was exposed for bids, the undisclosed "upset price" was pegged at $318,000. At no time did HUD give consideration to whether the property, at that price, might be susceptible to cooperative, condominium, or non-profit corporation acquisition.

Moreover, the "upset price" was fixed on the basis of capitalizing the rents which the property would produce on a regulated basis (*i. e.,* on the assumption that the purchaser would not be free to raise rents except in modest percentages). But, when the property was sold to the present private owner at a net price of $318,250, HUD decided not to impose any rental restrictions.

The HUD "Property Disposition Handbook Multi-family Properties," RHM 4315.1 provides (§ 290(a), p. 109):

". . . In developing analysis report and recommendation for sale of an acquired multi-family project, the local office shall include consideration of the condominium approach. An analysis shall be made for the purpose of determining whether a greater financial return can be realized or, in the case of a project housing families in the lower income group, a financial return approximately equal to that which could be anticipated from sale of the project as rental housing."

The same manual also provides (§ 290–1(b), p. 114):

". . . In considering the disposition of an acquired multi-family property where home ownership and tenant responsibility are important factors for the continued operation of the project, the local office shall include consideration of the cooperative approach . . . Multi-family projects housing many lower income families, including elderly and handicapped, should also be considered for cooperative sale provided a financial return will be approximately equal to that which can be expected from the sale of the project as rental housing . . ."

It does not appear that anyone at HUD ever considered the feasibility of the condominium or cooperative approach in the context of a sale price at the level ultimately decided upon, or that any comparison was ever made between what HUD would realize on the sale as consummated and what it might realize on a condominium or cooperative basis.

■ Plaintiffs' argument concerning the debarred characterization of the purchaser presents another facet of the same problem. Under applicable HUD regulations, persons who have been debarred are not ordinarily eligible to serve as HUD "contractors." While plaintiffs argue, with some force, that this includes "grantees" without limitation, HUD's reading of the regulation is that the question of debarment is relevant only with respect to persons who will be receiving continuing benefits from HUD in the form of rent subsidies, or who will have continuing obligations to HUD. Under this view, in the case of a cash sale with no restrictions, the identity of the purchaser is immaterial. On the record to date, I am persuaded that there is a reasonable likelihood that plaintiffs will succeed in showing either that HUD's interpretation of the regulations in question is inconsistent with the policies underlying both the regulations and the National Housing Act, or that the determination of the sale price to the corporation did result in conferring a continuing benefit, equivalent to a rent subsidy, upon the purchaser. In the latter connection, while the record has not been fully developed, it seems obvious that a sale price fixed by capitalizing regulated rents would necessarily be substantially below a sale price fixed by capitalizing unregulated rents.

■ For the foregoing reasons, and without considering any of the other issues raised by the plaintiffs, I am satisfied that, if this action had been instituted before the sale was consummated, plaintiffs would have undoubtedly had a reasonable prospect of succeeding in their efforts to block the sale. In my view, the most serious flaw in

plaintiffs' case is the possible application to them of the defense of laches. Plaintiffs did not know of the pendency of the sale proposal. Although some sections of the HUD manual seem to encourage notices to the tenants in situations of this kind, the only notice they would have been likely to be exposed to was a single advertisement in the local newspaper. Thus, plaintiffs cannot be held guilty of laches in failing to take action before the sale was consummated. They did, of course, learn of the sale shortly after it took place. It seems probable that their awareness that the property was no longer in the "public housing" realm did not become acute until the first round of rent increases, in January of 1975. The first formal action taken on behalf of the plaintiffs to challenge the December 1974 sale to the corporation occurred when their counsel wrote a letter to the Secretary of HUD, under date of July 14, 1975. At the hearing, it was stated by counsel that there had been continuing discussions and negotiations with the corporation in the preceding months.

On the present record, I do not believe the issue of laches should be decided against the plaintiffs. This does not, of course, foreclose that defense upon final hearing.

### IV. *Comparison of Irreparable Harm*

Unless evictions are stayed, plaintiffs will clearly suffer great and irreparable harm. While this would probably be true with respect to any public housing project, it is particularly clear in the present case, in view of the demonstrated absence of available housing for low and moderate income families in the Lancaster area.

One method of insuring that neither side would suffer any ultimate damage by the grant of interim injunctive relief would be to require the tenants, as a condition of continued occupancy, to deposit in escrow the difference between the rent they acknowledge to be payable, and the higher rent sought to be charged by the landlord. As a practical matter, however, the record establishes that the imposition of any such requirement would be equivalent to denial of interim relief to the plaintiffs.

I have concluded that the most nearly equitable approach to a solution of this problem is to require the tenants, as a condition of continued occupancy, to pay up all arrearages in rent, computed at the December 1974 levels (or at the levels prevailing when the tenant first occupied the premises, if that occurred after December of 1974), and at the same time to expedite the final hearing, so that the landlord's risk of loss in the event the defendants ultimately prevail will be minimized. When consideration is given to the fact that the purchase price was calculated on the assumption that the HUD-regulated rental levels would prevail, imposing upon the landlord some risk of non-recovery of additional rentals (in the event the landlord is ultimately successful on the merits) seems not unduly burdensome. Presumably, if the landlord is eventually successful on the merits, some further adjustments of future rentals could be made to cover interim arrearages.

While this solution is not entirely satisfactory, I believe it most nearly approximates striking the correct balance between competing equities.

The parties are requested to notify the Court of the earliest date by which they will be ready for final hearing. In the meantime, the non-federal defendants will be enjoined from attempting to evict any tenant who pays the rental undoubtedly due, and the plaintiffs will be enjoined from disposing of the rent deposited in escrow, except for the purpose of payment to the landlord.