**Jonell SWANN, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**GASTONIA HOUSING AUTHORITY; Dr. Cleveland Floyd, W. H. Keith, Robert Haygood, Sarah P. Knowles and Al Pollack Aldridge, Jr., each in his or her official capacity; Charles R. Kaylor, in his capacity as Executive Director of the Gastonia Housing Authority; and William Huffstetler, Defendants.**

No. 79–279.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Nov. 25, 1980.

Leslie Winner and Theodore O. Fillette, III, Legal Services of Southern Piedmont, Charlotte, N.C., for plaintiff.

Graham C. Mullen, Mullen, Holland & Harrell, P.A., Gastonia, N.C., for all defendants except William Huffstetler, pro se.

## ORDER

McMILLAN, District Judge.

This case was heard on October 8, 1980, on cross motions for summary judgment. All attorneys agree that there are no disputed facts, and that the case can be decided upon the fact stipulations, the affidavit of the plaintiff, and the verified pleadings. The record reveals the following:

The case was filed on September 21, 1979, as a class action under 42 U.S.C. § 1983 and 42 U.S.C. § 1437f, alleging improper termination of tenancies under the Section 8 Existing Housing Program.

The plaintiff, Jonell Swann, and her husband, James (who died after this suit was filed), were relocated during the summer of 1978 from a house in Gastonia which was slated for demolition. To satisfy its obligations under the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4601 et seq., the City of Gastonia provided relocation assistance by helping the Swanns obtain a Certificate of Family Participation in the Gastonia Housing Authority's Section 8 Program. The Section 8 Housing Assistance Program is a federal rent supplement program under which an eligible family may rent a privately owned dwelling. A family in the program pays directly to the owner 25% of the adjusted family income for rent and utilities, and the public housing authority guarantees the remainder of the fair market rent and pays that supplement directly to the owner.

In September, 1978, the Swanns moved into a house in Gastonia owned by the defendant, William K. Huffstetler, who agreed to participate in the Section 8 program. Plaintiffs signed a one–year lease. They have never violated any conditions of the lease and have always paid their portion of the rent.

In May, 1979, Mr. Huffstetler filed an action for summary ejectment, seeking to evict the Swanns. The Swanns were represented in that proceeding by Legal Services of Southern Piedmont. Mr. Huffstetler was persuaded to dismiss the action because of inadequate notice.

On August 15, 1979, Mr. Huffstetler wrote to the Swanns informing them that the lease would expire on September 15, 1979, and that he wanted them to vacate by October 1, 1979. Mr. Huffstetler gave no reasons for the desired termination.

On August 21, 1979, the Swanns, through Legal Services, requested that the defendant Housing Authority refuse to approve the termination of the lease or at least conduct a hearing. A conference but not a "hearing" on this subject was held on September 5, 1979 at the Housing Authority office. No evidence was presented. Mr. Huffstetler, the owner, stated that he might want to sell the house. The Director of the Housing Authority, the defendant Charles R. Kaylor, said that his intention was to take a "no action" position. Huffstetler announced his intention to evict the Swanns.

The Gastonia Housing Authority never sent the Swanns any notice stating the rea-

sons why their lease was being terminated. Mrs. Swann alleges that the real reason why Mr. Huffstetler did not renew the lease was retaliation for their engaging Legal Services to defend them in the May, 1979, ejectment action.

On September 21, 1979, plaintiff filed this suit. On September 26, 1979, Huffstetler withdrew his notice to vacate. Mrs. Swann has continued to live in the house.

### DISCUSSION

It is undisputed that the notice to vacate and to terminate the lease was given by the landlord, Mr. Huffstetler, rather than by the Housing Authority, and that the Housing Authority did not make a finding of good cause for the termination. Plaintiff argues that the attempted termination of the lease by Mr. Huffstetler was both a statutory violation of the provisions of the Housing and Community Development Act of 1974, 42 U.S.C. § 1437f, and a constitutional violation of the due process clause of the Fourteenth Amendment. The basic question confronting the court is whether a Section 8 tenancy may be terminated at the end of the lease term without a showing of good cause by the landlord and a determination of good cause by the Housing Authority. The statutory and constitutional claims will be examined separately.

### THE STATUTORY CLAIM

■ The Low Income Housing Act states at 42 U.S.C. § 1437f(d)(1)(B) that Section 8 contracts between a public housing agency and an owner shall provide that:

"B. the *agency* shall have the sole right to give *notice* to vacate, with the *owner* having the right to *make representation to the agency* for termination of the tenancy." [Emphasis added.]

Defendant argues unpersuasively that 42 U.S.C. § 1437f(d)(2) (which requires that the contract for an existing structure shall be for a term of not less than one month nor more than 180 months) controls, and renders the Housing Authority powerless to give notice to the tenant. The clear language of the Act expressly requires that the Housing Authority give the notice to the tenant to terminate the tenancy. The Act makes no distinction between notice given at the expiration of a lease term and notice given for a violation of lease conditions.

■ The more difficult question is whether the Low Income Housing Act requires the Housing Authority to make a finding of good cause for the termination before issuing a notice to vacate. The court is persuaded that the legislative history and the very purposes of the Act indicate that a finding of good cause is required. Congress would not have required the Housing Authority to issue the notice to vacate unless they intended that eviction not take place without a finding of good cause.

While the statute was making its way through the Senate, an amendment to Section 8 was proposed which would have given Section 8 landlords the authority to evict tenants directly without any review or action by the local Housing Authority. The proposal was rejected. The Senate report telling why the amendment was rejected reads in pertinent part as follows:

"In considering this bill, the committee rejected a proposal by the administration which would have permitted landlords of section 8 existing housing projects to evict tenants without review by the local public housing authorities (PHA) which administer the programs.

"The present law, which requires PHA approval, provides substantial protection for the tenant, such as the opportunity to object if the eviction violates the lease *or is without good cause*. . . . In addition, adoption of the proposal would leave section 8 tenants to rely on State and municipal laws for protection, and the committee does not feel that HUD has provided ample information on the extent to which this protection would be sufficient. Senate Report, No. 95–871, 95th Congress, Vol. 5 U. S. Code Congressional and Administrative News 4473, 4788." [Emphasis added.]

The stated purpose of the Low Income Housing Act is to aid lower–income families in obtaining a decent place to live and to promote economically mixed housing. 42 U.S.C. § 1437f(a). The parties have stipulated that providing a decent home and suitable living environment includes providing an atmosphere of stability, security and fairness.

The purpose of the Act would be frustrated if a landlord were allowed to participate in and take advantage of the economic security provided to landlords under the Act, and yet the tenant were stripped of any reciprocal security by being vulnerable to eviction without good cause at the expiration of the lease term. Congress could not have intended such unfairness and insecurity in an area as critical for low–income families as is basic housing.

## THE DUE PROCESS CLAIM

■ In order for the due process clause of the Fourteenth Amendment to require that a Section 8 tenancy be terminated only for good cause, the termination of the tenancy must be characterized as state action and Section 8 tenants must have a property interest in their tenancy at the expiration of the lease term. The court finds that both requirements are met in this case and that due process requires a determination of good cause.

Under the Low Income Housing Act, as discussed above, the Housing Authority has the sole right to issue notice to vacate. The termination of the tenancy by the Housing Authority, a government agency, is state action. Even if the statutory provisions and the HUD regulations, 24 C.F.R. § 882.-215, were construed to require that the Housing Authority only actively approve or disapprove or passively disapprove the termination, nevertheless the act of terminating the tenancy would still be state action. See Fenner v. Bruce Manor, Inc., 409 F.Supp. 1332, 1343 (D.Md.1976).

The state action requirement is met, however, regardless of whether the Act and regulations are interpreted to place the duty of giving notice of termination upon the landlord or upon the Housing Authority. Defendant argues that the action complained of is termination of the tenancy by the landlord, not by the Housing Authority, and that the court must confront Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), by examining the landlord's contacts with the government. Under Jackson, the inquiry is "whether there is a sufficiently close nexus between the State and the challenged activity of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." 419 U.S. at 351, 95 S.Ct. at 453. The Section 8 private landlord receives numerous benefits from participating in the program. The monthly risk of not receiving rent from the tenant is reduced because the Housing Authority is paying the majority of the rent and the tenant is paying an amount within his means. If a tenant vacates in violation of the lease, the landlord receives 80% of the contract rent for a vacancy period of up to sixty days. In exchange for these benefits, the landlord is restricted in tenant selection, 42 U.S.C. § 1437f(d)(1)(A), lease formation, 24 C.F.R. § 882, Appendix II, property maintenance, 24 C.F.R. § 882.109, and method of termination, 24 C.F.R. § 882.215. In fulfilling the government function of providing decent housing, the private landlord accepts the burdens of regulation as well as the benefits of additional security. The nexus between the state and the participating Section 8 landlord is clear. The landlord's acts in terminating one of these regulated tenancies constitute state action.

The question of a tenant's property interest in the tenancy at the expiration of the lease term is governed by the entitlement guidelines set out by the Supreme Court in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In the Roth case, the Supreme Court said the following:

"Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person

clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims." 408 U.S. at 577, 92 S.Ct. at 2709.

In *Joy v. Daniels*, 479 F.2d 1236 (4th Cir. 1973), the Fourth Circuit held that a tenant in a privately owned, federally subsidized housing project has a property interest in his tenancy beyond the end of the lease term, and stated that:

"One finds that the normal practice in subsidized housing, as in private housing, is to permit tenants to remain beyond the expiration of a lease unless a reason has arisen for eviction; termination is the exception, not the rule. Thus, tenants do have a reasonable expectation deserving of protection." *Joy v. Daniels*, 479 F.2d at 1241 quoting, Note, 'Procedural Due Process in Government–Subsidized Housing,' 86 Har.L.Rev. 880, 905 (1973)."

■ The parties have stipulated that the custom among landlords in Gaston County is to terminate tenancies or fail to renew leases only when there is some legitimate business reason to do so. Additionally, the Gastonia Housing Authority and owners and lessors in Gastonia's other federally subsidized housing programs do not terminate tenancies without cause regardless of the term of the lease. The evidence of custom in this case, as in *Joy v. Daniels, supra*, shows that tenants have a reasonable expectation of remaining in their rented homes beyond the expiration of a lease and that this expectation deserves protection.

There is additional evidence bolstering the tenant's expectation of or entitlement to the benefit of a renewed lease in a Section 8 tenancy. The legislative history of the Low Income Housing Act, previously cited, states that Congress gave the public

housing agency the sole right to issue notice to vacate in order to protect the tenant if the eviction violated the lease or was without good cause. The regulations, previously cited, imposed on the landlord with respect to tenant selection, lease formation, dwelling maintenance and tenancy termination, lead to a reasonable expectation that landlords are not to terminate arbitrarily. The automatic renewal of a Section 8 rental agreement at the end of a lease term if not appropriately terminated is further evidence of the expectation of continuity of the tenancy and of stability and fairness in the program.

Defendant argues that the property interest is in the Section 8 certificate itself, but not in the specific house leased, and cite *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) as authority. The *O'Bannon* plaintiffs were patients in a nursing home. They sought to require good cause hearings for the *patients* before their nursing home could be decertified from participation in Medicare and Medicaid programs. The Court held that patients have no interest in receiving care in a particular facility that entitles them to a hearing before that facility is decertified, because decertification does not terminate a patient's financial assistance and does not involve the withdrawal of direct benefits.

Several factual distinctions make *O'Bannon* inapplicable to the termination of Section 8 tenancies. First, although the Medicaid provisions challenged in *O'Bannon* give recipients the right to choose among qualified providers, as do the Section 8 provisions, the *O'Bannon* plaintiffs were seeking a hearing prior to *decertification of the facility* they had already chosen. *O'Bannon* would be analogous on this point only if the plaintiffs were seeking a hearing prior to a Public Housing Agency determination that Huffstetler's dwelling chosen by the tenant did not meet housing code standards and could therefore not continue to be rented under the Section 8 program. *O'Bannon* might also be analogous if the *O'Bannon* plaintiffs had challenged the manner in

which a certified nursing home transferred or discharged patients. *O'Bannon* involved direct government action against a third party which indirectly adversely affected an *entire category* of people. The direct action against the nursing home itself in *O'Bannon* required a due process hearing and decertification based on good cause which in a real sense protected the patients' rights. Here, however, we have a direct action against an *individual* with no procedural safeguards.

## CONCLUSION

Defendants' attorney expressed the fear that if the court ruled for the plaintiff, the question would then become, "Where does a Section 8 lease end?" The answer is that a lease signed pursuant to the Section 8 existing housing program will end upon a demonstration by the landlord to the Housing Authority that he has a good reason for terminating at the end of a lease term or that the tenant has violated a lease condition. A Section 8 landlord must understand from the beginning that if he decides to accept the benefits of participating in a Section 8 program, then he must agree to be fair to the tenant. The landlord is protected by Section 8 from financial losses resulting from arbitrary action by the tenant. The tenant likewise can expect to be protected from the loss of a home resulting from arbitrary actions by the landlord.

The court does not attempt to define good cause other than to note that good cause in similar situations generally means a good business reason. The Gastonia Housing Authority is familiar with conducting hearings for good cause determinations in lease terminations; they themselves do not, without good cause, evict tenants from the units which they operate. If Mr. Huffstetler decides to sell the house in which Mrs. Swann is living, or to live in it himself or to make extensive repairs, then he can request that the Housing Authority determine that good cause for termination exists and issue to Mrs. Swann a notice to vacate at the termination of the lease term. What he cannot do is to decide unilaterally that he will not renew the lease. The Housing Authority functions as the intermediary between the landlord and the tenant and says to the landlord that he cannot discriminate against certain people in selecting tenants, that he cannot include certain clauses in the lease, that he must maintain the property even above the minimum local housing code standards, and that he can evict only upon a showing of good cause.

IT IS THEREFORE ORDERED and for the reasons stated that defendants' motion for summary judgment is denied and plaintiff's motion for summary judgment is granted.

Plaintiff will submit an appropriate judgment.