**Nancy MITCHELL, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; Housing Authority for the County of Marin; Janet Miller-Schoder, in her official capacity as Executive Director of the Housing Authority of the County of Marin; Philip Chang Associates & Sons, a limited partnership, Defendants.**

**No. C–83–3153 RPA.**

United States District Court, N.D. California.

Aug. 23, 1983.

David B. Harrison, Legal Aid Society of Marin County, San Rafael, Cal., for plaintiffs.

Alfred Daubenfeld, Michael Burton, San Rafael, Cal., for defendants.

## OPINION AND ORDER

AGUILAR, District Judge.

Plaintiff brings this action on behalf of herself and on behalf of a class of all others similarly situated for declaratory and injunctive relief against: her landlord; the Housing Authority for the County of Marin; and the United States Department of Housing and Urban Development. On behalf of the class plaintiff seeks a declaration from the Court requiring good cause for nonrenewal of leases entered into under the Housing Assistance Payments Program of the Department of Housing and Urban Development, and corresponding injunctive relief. On behalf of herself plaintiff seeks an order from this Court requiring the defendants to renew her lease.

This action is now before the Court on plaintiff's motion for a preliminary injunction to restrain her landlord from evicting her and the Housing Authority from refusing to assist her in paying the rent for her apartment in Novato, California until proceedings in this lawsuit have concluded.

I. THE CONTRACTUAL SCHEME BEHIND THE HOUSING ASSISTANCE PAYMENT PROGRAM

A. *The Rental Limitation Agreement*

Plaintiff's landlord is defendant Philip Chang Associates & Sons (hereinafter re-

ferred to as "Chang"). In 1973, the preceding owner of the property wanted the property rezoned so that he could build the apartment complex. Chang's predecessor and the County of Marin entered into an agreement, amended in 1978, which provided that in consideration for the rezoning, Chang's predecessor agreed:

to rent or lease ten two-bedroom apartment units to residents with low, moderate or middle incomes, who qualify for participation in the Section Eight Housing Assistance Payment Program of the U.S. Department of Housing and Urban Development (HUD) or in any other housing assistance program created and/or approved by COUNTY.

This agreement also provided:

It is agreed and understood by the parties that the above mentioned units will be apportioned among the various buildings of the project . . . .

The agreement specifically binds successors and assigns until 1996, and it is specifically stated that the agreement shall run with and bind the land.

### B. The Annual Contributions Contract (ACC)

The Marin Public Housing Authority and the United States of America enter into an annual contributions contract (hereinafter referred to as ACC), pursuant to which the United States provides financial assistance to the Housing Authority for the purpose of making housing assistance payments.

### C. The Housing Assistance Payments Contract

The Marin Public Housing Authority and landlord Chang have entered into a Housing Assistance Payments Contract. By this contract the Housing Authority obligates itself to pay a designated portion of the assisted family's rent. In the present case, the Housing Authority contracted to pay Chang $266 of the $350 total monthly rent. Under the heading *Term of Contract* it is provided:

The term of this Contract shall be one years [the term of the Lease] beginning on 2–1–82; Provided, however, that if the Family continues in occupancy, after the expiration of the term, on the same terms and conditions as the original Lease, the Contract shall continue in effect for the duration of such tenancy, but the total duration of the Contract shall in no case extend beyond the term of the ACC.

### D. The Tenant/Landlord Lease

Tenant Mitchell entered into a lease with landlord Chang. The term of this lease is stated as twelve months, beginning on February 1, 1982 and ending on January 31, 1983. Under the heading LEASE RENEWAL it is provided:

Should the Tenant hold over the dwelling after this lease has terminated, the same terms and conditions of this agreement shall continue to be binding on the parties as a month to month agreement.

Under the heading TERMINATION OF LEASE it is provided:

This Lease shall terminate upon the date of any termination of the Housing Assistance Payments Contract, including any termination due to termination of eligibility of the Tenant.

## II. FACTS

On February 2, 1982, plaintiff entered into a one year lease with defendant Chang for an apartment in Novato, California. The apartment was for plaintiff and her two children. Also on February 2, 1983, defendant Marin Public Housing Authority entered into a Housing Assistance Payments Contract with defendant Chang. On November 5, 1982, Chang notified plaintiff that it did not intend to renew her lease, due to expire on January 31, 1983. Plaintiff did not vacate the premises, and on February 24, 1983, Chang filed a complaint for unlawful detainer in the Marin County Municipal Court. On May 26, 1983 the Municipal Court entered judgment restoring the premises to Chang. Plaintiff has appealed, but has been unable to obtain a stay of her eviction.

Plaintiff then filed this class action complaint in this Court and received a tempo-

rary restraining order from the Court prohibiting Chang from evicting plaintiff, and requiring the Housing Authority to continue to pay its share of plaintiff's rent payments, until the hearing on plaintiff's motion for preliminary injunction was held.

In support of her motion for preliminary injunction, plaintiff contends that defendants failed to renew her lease without showing good cause for non-renewal, and without permitting her the opportunity to be heard on the issue of good cause. Plaintiff contends that she is likely to succeed on the merits of this action because good cause must be established to fail to renew a Housing Assistance Payments Program lease, and that she will suffer irreparable harm if an injunction is not granted because of the scarcity of low income housing in Marin County.

## III. DISCUSSION

### A. *Mootness*

Before discussing the propriety of the preliminary injunction, defendants' contention that this action is moot must be addressed. Defendants contend that plaintiff did in fact have the opportunity to litigate the question of good cause in the municipal court, and therefore, this action is moot. As there was good cause for the non-renewal of plaintiff's lease, and as plaintiff had the opportunity to show the absence of good cause, there is no live case or controversy upon which the Court can rule.

■ The cause for non-renewal of plaintiff's lease was mentioned in Chang's motion for summary judgment in the state court unlawful detainer proceedings. It cannot be said, on the basis of the record now before the Court, that there was full and fair opportunity in the state proceedings for plaintiff to litigate the question of good cause for non-renewal. Additionally, though the Court cannot condone certain of the activity plaintiff has admitted to as a tenant, the bulk of the incidents which de-

fendants contend constitute good cause for non-renewal are the subject of conflicting facts and testimony, which the Court will not resolve at this stage in the proceedings. Therefore, the action is not moot at this time.[1]

### B. *Preliminary Injunction Principles*

■ In order for the Court to issue a preliminary injunction, there must be a clear showing that: there is a probability of success by plaintiffs on the merits *and* possible injury to plaintiff; *or* there are sufficiently serious questions going to the merits to make the questions fair ground for litigation *and* a balance of hardships that tip decidedly toward plaintiff. *Aguirre v. Chula Vista Sanitary Service,* 542 F.2d 799, 781 (9th Cir.1976). These two alternative tests have been described as "extremes of a single continuum." *Benda v. Grand Lodge of International Association,* 584 F.2d 308, 315 (9th Cir.1978); *cert. denied,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). Thus, where there is a compelling likelihood of success on the merits, the injury to the party seeking relief need be only "possible," but where the likelihood of success is less clear (but still a fair ground for litigation), greater potential harm to the party seeking relief is required as compared to any harm possibly coming to the defendant. In deciding whether to grant a preliminary injunction, the Court must also consider the public interest. Even where the likelihood of success on the merits is great, the Court may not grant a preliminary injunction where to do so would be harmful to the public interest. *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834 (1943).

### C. *Harm and Hardship*

■ Plaintiff asserts that she will be irreparably harmed if the preliminary injunction is not issued because she will be evicted from her home and will likely be unable to find other affordable housing. The scarcity

1. The Court recognizes that if it were presented with a clear record of the state court proceedings indicating that good cause for non-renewal was fully litigated there, or if it were presented

with uncontroverted facts, the mootness issue may require the Court's further consideration. An evidentiary hearing on the question of mootness may be appropriate at a later date.

of public housing constitutes irreparable harm sufficient to preliminarily enjoin eviction. *Tenants for Justice v. Hills,* 413 F.Supp. 389, 393 (E.D.Pa.1975); *and see Owens v. Housing Authority of City of Stamford,* 394 F.Supp. 1267, 1271 (D.Conn. 1975). This conclusion is more compelling in a county such as Marin, which does not have a significant amount of low income housing.

Defendant Chang asserts that the balance of hardship favors defendants. Chang asserts that the Housing Authority for Marin has provided plaintiff with many referrals for new housing since Chang has attempted to evict plaintiff, but that plaintiff has refused to follow up on any of the referrals. Additionally, Chang contends that the balance of hardships tips its favor because plaintiff has demonstrated no desirability as a tenant, and has had nasty encounters with the managers of the apartment building. Chang asserts that it will be harmed by the entry of the preliminary injunction because of its effect on the performance of the apartment manager's responsibilities since other tenants know of plaintiff's lawsuit.

Again, Chang's version of plaintiff's conduct is disputed by plaintiff. And any harm to Chang, and the apartment manager, if the preliminary injunction is granted, is far outweighed by the irreparable harm that could come to plaintiff if the injunction is not granted. If a preliminary injunction is not issued, plaintiff would lose her home. As plaintiff has children, the injury caused by loss of a home is far more significant. If plaintiff and her children are unable to locate housing they can afford, they would be homeless and subject to the many perils that homelessness brings. Even if plaintiff could quickly locate new housing, it would likely be in another community. Such a move would be disruptive to her life, and particularly to the lives of her children, because of the loss of friends and community contacts and a change in schools. Any injury to defendants is minimal. If plaintiff is able to find other housing, the housing authority will still have to monetarily assist plaintiff as she is still eligible for assistance. And because there is no indication in the record that plaintiff has caused any incidents at the apartment building for a number of months, her continued occupancy of her apartment unit is not harming Chang.

The Court finds that plaintiff could suffer irreparable harm if the preliminary injunction is not issued.

### D. *Success on the Merits*

As plaintiff's harm is irreparable, plaintiff need only show serious questions deserving of litigation for the Court to enter a preliminary injunction. *Aguirre v. Chula Vista,* 542 F.2d at 781. The question before the Court then is whether the contention that good cause must be shown to fail to renew the lease of a housing assistance tenant presents serious questions deserving of litigation.

#### 1. *Old Law of Housing Assistance*

Prior to October 1, 1981, the Low Income Housing Act provided that all assistance payment contracts (the contracts between the landlord and the Housing Authority), contain a provision that "the agency shall have the sole right to give notice to vacate, with the owner having the right to make representations to the agency for termination of tenancy." 42 U.S.C. § 1437f(d)(1)(B) (1976). The old statute also provided that all assistance payment contracts be "for a term of not less than one month nor more than one hundred and eighty months." 42 U.S.C. § 1437f(d)(2) (1976). Numerous courts held that individuals who were tenants under the Act had, pursuant to this Congressional scheme, a constitutionally protected property interest in an expectation of continued occupancy of their rental units, and receipt of rent subsidies, until the end of their lease terms. Thus, a mid-term termination could only be made upon a determination by the Housing Authority that "good cause" existed for the termination. *See Jeffries v. Georgia Residential Finance Authority,* 678 F.2d 919, 925 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 302, 74 L.Ed.2d 283 (1983), and cases cited therein.

One court has addressed the question of whether good cause was required for failure *to renew* a housing assistance lease under the old version of the Act. *Swann v. Gastonia Housing Authority,* 675 F.2d 1342 (4th Cir.1982),[2] involved a housing assistance tenant who was informed that his one-year lease would not be renewed. The court found that although "no explicit good cause requirement" was contained in section 1437f, "we think that one was implied by the language of § 1437f(d)(1)(B)." *Id.* at 1345. The court reasoned that as the Act gave the housing authority the sole right to give notice to vacate, this provision would be pointless if the housing authority was not to exercise some judgment before an eviction occurred. *Id.* Thus, the *Swann* court held that as a housing assistance tenant has a statutory entitlement to continue in the occupancy of the rental unit in the absence of good cause for eviction, the tenant has a constitutionally protected property right to continued occupancy of the rental unit, despite lapse of the term of the lease, in the absence of good cause for eviction. *Id.* at 1346.

### 2. *Current Housing Assistance Law*

An amended version of section 1437f took effect for all leases entered into after October 1, 1982, and so is applicable to plaintiff's lease herein. This new version of section 1437f provides in relevant part:

Contracts to make assistance payments entered into by a public housing agency with an owner of existing housing units shall provide (with respect to any unit) that—

. . . . .

(B)(i) the lease between the tenant and the owner shall be for at least one year . . . and shall contain other terms and conditions specified by the Secretary; and

(ii) the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Fed-

eral, State, or local law, or for other good cause;

. . . . . .

42 U.S.C. § 1437f(d)(1).

Although the amended statute does not change the restrictions governing the term of the assistance contract (not less than one month nor more than one hundred and eighty months), the statute now provides that the assisted lease shall be for at least one year.

The amended statute provides no definition of "terminate", and no cases have yet addressed the issue of whether good cause is statutorily or constitutionally required under amended section 1437f when a landlord does not renew the lease of a housing assistance tenant.

The Department of Housing and Urban Development has issued a regulation interpreting amended section 1437 with respect to a good cause requirement for a failure to renew such a lease.

The Contract and the Assisted Lease shall provide with respect to the unit that the Owner shall neither (i) terminate the tenancy during the term of the Contract and Assisted Lease, nor (ii) refuse to enter into a new Assisted Lease with the Family, unless the Owner decided not to enter into a new Contract with respect to the unit, except for;

(1) Serious or repeated violation of the terms and conditions of the Lease;

(2) Violation of applicable Federal, State or local law; or

(3) Other good cause.

24 C.F.R. 882.215(b).

In explanation of its regulation the Department states:

The Department does not intend to define the bases for termination of tenancy by the owner with more specificity than stated in the statute. Application of the statutory standards to particular cases should be determined by the courts,

2. And see lower court opinion, *Swann v. Gastonia Housing Authority,* 502 F.Supp. 362 (W.D. N.C.1980).

normally in the course of the eviction proceeding brought by the owner. The statute and regulation also no longer require that the PHA play any role in the eviction process.

At the end of the term of an assisted lease, the owner may decide not to re-lease the unit with Section 8 assistance, either to the original assisted family or to another assisted family. In this case, the owner is no longer bound by the statutory limitations on the allowable grounds for termination of tenancy. The Conference Report on the 1981 amendments states with respect to the new statutory provisions on the grounds for termination of tenancy that:

It is not the intention of the Conferees that these statutory provisions govern the relationship between a landlord and a tenant after a landlord has, in good faith, terminated his participation in the Section 8 existing program. (House Report No. 97–208).

If, however, the owner has not terminated participation in the program with respect to the unit, and desires to lease the same unit to another assisted family, the owner may not refuse to enter into a new assisted lease with the original family except in accordance with the statutory good cause standards for termination of tenancy.

The application of good cause standards to an owner's refusal to enter into a new lease with the original family depends only on the owner's intentions with regard to leasing of the same unit, and is not affected by the owner's intentions or practices with respect to leasing of other units in the same building or in other buildings.

Thus, the owner may rent the same unit to a market rate tenant without Section 8 assistance, or may withdraw the unit from rental use, even if the owner continues to rent other units to Section 8 tenants under the Section 8 Existing Housing Program. By the statutory language of Section 8(d)(1), the obligations of the owner under the assistance contract, including the statutory good cause standards for termination of tenancy, only apply "with respect to any unit" subject to the assistance contract. In addition, in the Section 8 Existing Housing Program, the owner participates in the program by entering into an assistance contract for a single unit, and the obligations associated with such participation are related only to that particular unit.

The Department does interpret amended section 1437f to impose certain prerequisites to a landlord's decision not to renew an assisted housing lease, specifically, violation of terms and conditions of the lease by the tenant, violation of law by the tenant, or "other good cause". However, the Department's interpretation establishes what can be best described as an "individual unit loophole": None of the above-mentioned prerequisites need be met when a landlord seeks not to renew an assisted lease if the landlord decides not to continue renting the specific rental unit pursuant to the housing assistance program. Thus, a landlord can refuse to renew a lease without a showing of good cause as long as the exact same rental unit previously subject to the lease is not re-leased to another housing assistance tenant. Therefore, under the regulation and the Department's interpretation, plaintiff's landlord need not show good cause in refusing to renew her lease because the landlord intended to remove the rental unit from the housing assistance obligation.

Plaintiff contends that the regulation is unenforceable as overly restrictive for two reasons. First, the regulation is contrary to legislative intent as Congress did not intend to authorize what this Court has termed as an "individual unit loophole". Second, the regulation fails to recognize the tenant's constitutionally protected property interest in the renewal of a housing assistance lease. Both contentions are serious and deserving of litigation.

### a. Legislative Intent

As to the question of the legislative intent, in amended section 1437f Congress used the phrase "terminate the tenancy".

If Congress had intended the good cause requirement to be applicable only to mid-lease evictions, it could have easily selected the phrase "terminate the lease". Congress did therefore appear to require good cause for non-renewal of an assisted lease. The Department has largely interpreted section 1437f in a consistent fashion with this legislative intent by requiring good cause· for non-renewal if the same rental unit is to be rented to another housing assistance tenant.

However, the Department interpreted amended section 1437f as exempting non-renewals from the explicit good cause requirement where the particular rental unit involved is not to be re-leased to a housing assistance tenant. This portion of the regulation appears to have transgressed the legislative intent behind the statute. There is no express language in section 1437f supporting the "individual unit loophole." The "(with respect to any unit)" language that appears in amended section 1437f does not seem to have any applicability to the proposition that good cause need not be shown when a rental unit previously leased by an assisted tenant will not be re-leased to an assisted tenant. Rather, this language merely seems to require that certain provisions be contained in the assistance payments contract for each housing unit. And the portion of the House Report relied upon by the Department in enacting the regulation, ("[I]t is not the intention of the Conferees that these statutory provisions govern the relationship between a landlord and a tenant after a landlord has, in good faith, terminated his participation in the Section 8 existing program" H.Rep. 97–208 97th Cong., 1st Sess. 695, *reprinted in* 1981 U.S. Code Cong. & Ad.News 396, 1010, 1053–1054), does not support the "individual unit loophole" as this excerpt indicates only that the landlord's termination of his or her participation in the *entire assisted housing program,* as opposed to a single, isolated lease, ends the obligation to comply with the good cause for termination of tenancy requirements.

In most instances, the rental units of a landlord that are part of the assisted housing program represent only a small portion of the rental units in an apartment complex, with the remaining units rented to the general public. The regulation creates a situation where a landlord can arbitrarily fail to renew an assisted tenant's lease by transferring the obligation to provide assisted housing to another unit of the apartment complex. A landlord can "play musical chairs" with the apartments in the complex and thereby completely circumvent the explicit Congressional requirement that a tenancy not be terminated unless good cause is shown.

The "individual unit loophole" created by the Department's interpretation of section 1437f can also be viewed as contrary to the Congressional intent to help low income families secure a decent place to live, and to promote economically mixed housing. *See* 42 U.S.C. § 1437(a). Landlords could comply with their housing assistance obligations while "playing musical chairs" with their apartments until they find the low income tenants they desire. Mixed housing would be hindered. And more importantly, a large percentage of assisted tenants would be required to relocate every year. This continual relocation would defeat the elements of security and stability essential for a residence to become a "home", and therefore be detrimental to the tenant as well as to the welfare of the general public. Simply providing housing, without also providing some certainty in that housing, cannot be considered to accomplish the objectives of Congress in enacting the Housing Act.

The Housing Authority for the County of Marin asserts that a requirement of good cause for any non-renewal of an assisted housing lease is contrary to Congressional intent because the requirement would discourage voluntary participation by landlords in the housing assistance program by imposing onerous burdens on terminating tenancies. The good cause requirement for non-renewal is not an onerous burden upon the landlord. Good cause can be business or economically based. *Swann v. Gastonia Housing Authority,* 502 F.Supp. 362, 367 (W.D.N.C.1980), *aff'd. on other grounds,* 675 F.2d 1342 (4th Cir.1982). If the landlord

can show a good business reason to remove a unit from the housing assistance program, such as where the landlord decides to make necessary renovations, the good cause requirement is met. The good cause requirement therefore is not onerous, but merely fair.[3]

The Housing Authority also argues that Congress must have intended that good cause not be required for non-renewals of tenancies as it would be inconsistent for Congress to provide for a specific term for the assisted lease (at least one year), indicating an intent to provide for the expiration of such a lease, and at the same time to provide that the tenancy which arises from the lease cannot be terminated except for specific reasons. This argument is belied by the Department's interpretation of Congress' intent. The Department provides in the regulation that non-renewals of assisted leases must be supported by specific reasons where the housing unit is to be re-leased to another assisted tenant. Additionally, providing for a specific lease term can be seen as not inconsistent with a good cause for non-renewal requirement. For example, a business decision to renovate a housing unit subject to an assisted lease could be considered good cause *not to renew* an assisted lease and to remove the unit from the assisted housing obligation, but would not be considered good cause *to terminate* a lease mid-term.

Finally, defendants contend that there is an inconsistency in providing a maximum term for the duration of the assistance con-

tract between the landlord and the housing authority, and requiring good cause for terminating the assisted lease. The bases for terminating the assistance contract is not relevant to the issues raised by plaintiff. Where the housing authority wants to terminate a tenancy, different legal questions are raised. And certainly, if the housing authority terminates assistance, good cause is present for the landlord to terminate the tenancy. Thus, Congress' decision to provide for a maximum term for the assistance contract does not appear to affect the obligation on the part of the landlord not to terminate a tenancy without good cause.

In conclusion, the Court finds that there are serious issues deserving of litigation as to whether Congress intended that good cause be required for non-renewal of a housing assistance lease. It should be noted that if Congress did so intend, assisted tenants would have a statutory entitlement to renewal of their assisted leases, raising a serious question deserving of litigation that housing assistance tenants have a federally protected interest in renewal of their assisted leases in the absence of good cause for non-renewal. *See Swann,* 675 F.2d at 1346.

#### b. *Property Interest*

Even if Congress did not intend to require good cause for non-renewal of a housing assistance lease, plaintiff presents a serious question deserving of litigation that the housing assistance tenant in a privately owned housing complex has a constitutionally protected property interest in contin-

---

**3.** The Court is fully cognizant of the following portion of the Senate Report on amended section 1437f which states that the amendment:
is intended to minimize the disturbance of the private relationship under State law between the unit owner and the tenant. The provision of housing opportunities for assisted families depends on voluntary participation by private owners of existing housing. The proposal would assure owners that the procedural and substantive rights of the assisted tenant are the same as those applicable to non-subsidized tenants. The amendment is expected to encourage more owners to participate in the Section 8 existing housing program. S.Rep. 97–139, 97th Cong., 1st Sess. 256, *reprinted in* 1981 U.S.Code Cong. & Ad.News 396, 552.

However, this language cannot be considered to stand for the proposition that good cause is not required for non-renewals, as is the case in the private sector, in light of the explicit language in section 1437f requiring good cause for termination of tenancies, as opposed to termination of leases. And again, the good cause requirement for non-renewal, as discussed above, is not so onerous as to discourage landlords from participating in the housing assistance program, in light of the benefits they receive from the program. Thus, this statement of intent does not negate the serious issues raised by plaintiff in this lawsuit as to whether Congress intended that good cause must be shown for failure to renew any housing assistance lease.

ued tenancy beyond the term of the assisted lease. If such an interest is found, constitutional protections attach to the termination of the tenancy. Such constitutional protection would likely require, at the least, good cause for termination of the tenancy.

A constitutionally protected property interest in renewal of an assisted lease would arise from the normal practice in private housing, and in other federally subsidized housing programs, not to terminate a tenancy, despite the ending of a lease term, until there is a good reason to do so. *Swann,* 502 F.Supp. at 366; *and see Joy v. Daniels,* 479 F.2d 1236, 1241 (4th Cir.1973).

## IV. CONCLUSION

For the reasons expressed above, the Court finds that plaintiff will suffer irreparable harm if a preliminary injunction is not issued, and that plaintiff raises serious issues going to the merits that are deserving of litigation. Accordingly, the Court grants plaintiff's motion for a preliminary injunction preventing: (1) defendants from failing to continue plaintiff's tenancy pending the outcome of this litigation; (2) the housing authority from failing to make assistance payments on behalf of plaintiff to Chang pending the outcome of this litigation; (3) Chang from taking any steps to remove plaintiff from the rental premises pending the outcome of this litigation; and (4) the execution of the judgment in the municipal court.[4]

This Opinion and Order shall constitute findings of fact and conclusions of law.

IT IS SO ORDERED.

4. The Court signed and filed the Preliminary Injunction after the July 14, 1983 hearing of    this matter.