In re the Marriage of Patricia M. GENERAL, Petitioner, Respondent,

v.

Max A. GENERAL, Appellant.

No. C8–86–1572.

Court of Appeals of Minnesota.

July 14, 1987.

Darrold Persson, Matonich & Persson, Hibbing, for respondent.

James F. Clark, Jr., Abate, Wivoda, Clark & Prebich, Hibbing, for appellant.

Heard, considered, and decided by RANDALL, P.J., and WOZNIAK and NIERENGARTEN, JJ.

## OPINION

WOZNIAK, Judge.

Appellant Max General appeals from the trial court's post-decree order, granting re-

spondent Patricia General's motion for maintenance arrearages and attorney's fees, and partially granting Max's countermotion for termination of the maintenance obligation by reducing the monthly maintenance payment from $950 to $300. Patricia did not file a notice of review and requested only that the trial court be affirmed in all respects. We affirm.

## FACTS

Max and Patricia were married in 1958. They had three children, all of whom were over 18 at the time of the parties' divorce in December 1982.

At the time of the dissolution, Max was self-employed, operating General's Vegetable Markets in Hibbing and Virginia, Minnesota. Max was awarded the vegetable market business and equipment, and unencumbered real estate. The decree does not list his income, but Max claimed a business profit of $6,180 on his individual income tax return for 1982; however, his personal financial statements were more indicative of his financial standing at the time of dissolution. These statements revealed that he had earned salary of $48,000 in 1982, his businesses had gross sales of over two million dollars, and he had a net worth of over $800,000.

At the time of the dissolution, Patricia worked as a nurse part-time, netting $500 per month. The judgment awarded her the homestead and unencumbered real estate in approximately equal value to assets awarded to Max. She was also awarded maintenance of $950 per month until remarriage.

After the dissolution, Max married Kay, the bookkeeper for his business. About one year after his remarriage, in January 1984, Max changed his former sole proprietorship to several corporations, including General Trucking, Inc., General Markets, Inc., General Land Development, Inc., and the Howard Saloon and Eatery, Inc. The corporations were interrelated and loaned money to each other, performed services for each other, and leased and rented property to each other. The corporations paid for Max's and Kay's personal expenses such as housing, utilities, and food. The four corporations were all privately owned by Max and Kay, and Kay became the only bookkeeper for all of the corporations. After Max was insulated from personal liability, he stopped making maintenance payments.

The claimed decline in Max's prosperous businesses started shortly after incorporation. While Max's income tax returns had always indicated he was living in poverty, Max claimed his net worth also began declining.

*Max's financial standing.* In 1982, the vegetable markets' gross sales amounted to $2,422,000. Max's personal financial statement for 1982 revealed a net worth of $814,000 and a salary of $48,000 per year. He claimed business income of $6,000 on his income tax return.

In 1983, the vegetable markets' gross sales totaled $2,423,000. Max reported taxable business income on his tax return of $2,035. This report was based on only ten months of sales because Max incorporated his businesses in November 1983. In January 1984, Max claimed a net worth of $791,-000 and a yearly salary of $50,000.

In fiscal 1984, the vegetable markets' gross sales totaled $2,623,000. For the next six-month period ending May 31, 1985, the vegetable markets' gross sales totaled $1,116,000. Max filed no corporate returns for 1985, but claimed business income of $4,295. At the hearing, Max claimed his net worth dropped from $800,000 at the time of the dissolution to "zero" in 1985.

In late 1984, Max closed the trucking business. At the close of the year, the trucking business showed a net profit of over $80,000. Max and Kay decided to sell the business, however, and sold the trucks for a loss, wiping out any gain and ending with a net loss of $23,000.

In 1985, Max closed the vegetable markets, claiming debt to the bank and creditors of $700,000. Neither he nor Kay was personally liable on any of this debt. He has since opened a new vegetable business hoping to make enough money to pay the

13 creditors from the previous vegetable markets.

*Patricia's income.* During this period, Patricia worked about the same hours, with a slightly higher hourly wage than at the time of the dissolution. In November of 1984, she had open heart surgery, causing her to miss work through March 1985. During that time she was paid sick benefits, but did not receive her usual net income. She is currently in poor health.

*The hearing.* Patricia brought a motion requesting a judgment in the amount of arrearages and attorney's fees. Max brought a countermotion requesting termination of the maintenance obligation.

Patricia's expert witness, Thomas Lee, a CPA, testified that Max's compilations were prepared by an LPA, rather than a CPA, and that LPA's are probably not qualified to prepare compilations. The compilation, unlike an audit or a review, has no guarantee of accuracy and compilations are "at the bottom as far as reliability goes." The specific problems found in the compilation included failure to comply with GAAP (Generally Accepted Accounting Procedures); failure to disclose the type of inventory, debt, accounts receivable, and intercorporate transactions; and failure to take a proper inventory or physical count. Max testified that no physical inventory was ever taken. GAAP requires inventory at least yearly, with physical counting of the merchandise. The inventory is crucial in determining the gross sales figure, which, in turn, is necessary to determine financial standing.

The most suspect problem was the erratic declining rate of markup (or profit), from an average of 35% to less than 10% in one year. The CPA stated that such a large decline in markup for one year was unusual and hypothesized that the declining markup was probably caused by understating the goods sold, overstating the cost of goods, inordinate spoilage, or improper inventory. A misstatement of markup would result in a showing of greater loss than actually existed.

The CPA was unable to trace exactly how the decline occurred or the corporations' correct gain/loss figure. Max claimed he had plunged from near-millionaire status (net worth of $800,000 at the time of the dissolution) to poverty (claimed net worth of –$3,000). Yet, he seemed to have little working knowledge of the financial status of the corporations other than his claim that his businesses were losing money and failing. He did not call any expert witness, and neither he nor Kay was able to adequately explain the discrepancies in their corporations' books.

The trial court failed to attach a memorandum to its order, but found that the corporations' decline occurred, in part, from the poor economy on the Iron Range, but did not cause the degree of loss Max claimed. It concluded that terminating maintenance was inappropriate, but held Max liable for $600 per month maintenance in arrearages and required Max to continue paying $300 of the original $950 maintenance obligation. It also granted Patricia $2,500 in attorney's fees. Max appealed. Patricia did not file a notice of review and requested only that the trial court be affirmed in all respects.

## ISSUES

1. Did the trial court abuse its discretion in modifying, but not terminating, appellant's spousal maintenance obligation?

2. Did the trial court abuse its discretion in not forgiving accumulated spousal maintenance arrearages?

3. Did the trial court abuse its discretion in awarding respondent $2,500 in attorney's fees?

## ANALYSIS

 1. The trial court has broad discretion in its decision to modify maintenance awards. This court will reverse only where there is a clearly erroneous conclusion that is against the logic and facts on the record. *Rutten v. Rutten,* 347 N.W.2d 47, 50 (Minn.1984). This court must defer to the trial court's assessment of credibility of witnesses and the weight to be given to their testimony. *Fontaine v. Hoffman,* 359 N.W.2d 692, 694 (Minn.Ct.App.1984).

■ The terms of a decree respecting maintenance or support may be modified upon a showing of:

(1) substantially increased or decreased earnings of a party;

(2) substantially increased or decreased need of a party * * *, any of which makes the terms unreasonable and unfair.

Minn.Stat. § 518.64, subd. 2 (1986).

The trial court found that Max's earnings had decreased, stating:

The current economic conditions on the Iron Range have led to a drop in Respondent's vegetable market business and an overall decrease in Respondent's income, to a certain degree, such that the overall total maintenance obligation of $950 per month does appear to the Court at this time to be unreasonable and unfair.

The trial court did not find that the economic conditions on the Range caused the degree of loss claimed by Max, stating:

The Respondent has failed to adequately explain to the court's satisfaction the discrepancies present in his financial statements and income tax returns, both personal and corporate, including the marked drop in his net worth and annual salary or income in recent years.

Max and Kay chose not to bring in an accountant to buttress the representations of the tax returns and the financial statement or to explain any of the assertions raised by the CPA. In *Solon v. Solon*, 255 N.W.2d 395 (Minn.1977), the supreme court stated:

The husband had a duty to supply information in a proper way and to make a full and accurate disclosure of his assets and liabilities [in tax returns and financial statements]. Failure to do so justifies inference adverse to the party who conceals or evades.

*Id.* at 396. The trial court was justified in drawing an adverse conclusion from the failure to adequately explain the discrepancies in the tax returns and the drastic reduction in net worth and annual salary. Under these facts, it was not erroneous for the trial court to reject termination of the maintenance obligation.

■ 2. Regarding the arrearages, a court is correct in refusing to forgive arrearages when the party requesting forgiveness failed to provide sufficient information regarding his actual income for evaluation by the court. *See Sulzbach v. Sulzbach*, 395 N.W.2d 451, 453 (Minn.Ct. App.1986). Although the trial court did not deny Max's motion in its entirety, based on *Sulzbach*, its decision to partially modify because of discrepancies in his income statements was appropriate.

In addition to the discrepancies in tax returns and the financial statement as noted above, Max and Kay traveled frequently. While Max maintained that most of the trips were business trips, he never made an effort to pay maintenance after he incorporated his businesses, enabling the corporations to pay all of his and Kay's expenses. He allowed judgments to be taken against him, without making an effort to make any type of payment. Accordingly, the trial court concluded that failure to pay was willful and allowed judgment for all arrearages accruing at the rate of $600 per month since the last judgment was entered (the rate of temporary maintenance ordered at the previous hearing).

Given Max's failure to make any sort of good faith payment and his failure to clarify his financial standing, the trial court appropriately refused to forgive all arrearages.

3. Regarding the award of attorney's fees, the statute provides:

In a proceeding brought either for dissolution or legal separation under this chapter, the court, from time to time, after considering the financial resources of both parties, may require one party to pay a reasonable amount necessary to enable the other spouse to carry on or to contest the proceeding, and to pay attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement or after entry of judgment.

Minn.Stat. § 518.14 (1986).

■ The trial court need not make specific findings of the need of a party for

legal fees, as long as the trial court considered those needs, observed the services performed, and correctly assessed their value. *See Clark v. Bullard,* 396 N.W.2d 41, 46 (Minn.Ct.App.1986). This court has stated "[w]e will rarely reverse the trial court on its response to a request for attorney fees" in dissolution actions. *Zagar v. Zagar,* 396 N.W.2d 98, 102 (Minn.Ct.App. 1986).

Patricia testified her fees would be between $3,000 and $5,000 to defend this motion, including hiring a CPA to review the records and testify. The trial court's award of $2,500 in attorney's fees was not an abuse of discretion.

## DECISION

The trial court is affirmed in all respects.