**CIMARRON VILLAGE, Respondent,**

v.

**Cynthia WASHINGTON, et al., Appellants.**

**No. C8–02–1387.**

Court of Appeals of Minnesota.

April 22, 2003.

Mary G. Dobbins, Mary G. Dobbins & Associates, Edina, MN, for respondent.

Lisa R. Hollingsworth, Southern Minnesota Regional Legal Services, Inc., Prior Lake, MN, for appellants.

Considered and decided by TOUSSAINT, Chief Judge, LANSING, Judge, and HUSPENI, Judge.

## OPINION

HUSPENI, Judge.*

Appellants Cynthia Washington and Clyde Penny challenge the district court's

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

grant of a writ of recovery.[1] Respondent Cimarron Village, which is federally subsidized under 26 U.S.C. § 42 (2002), sought to evict appellants due to numerous lease violations throughout their tenancy. The district court found that the lease violations, considered in their totality, provided Cimarron Village with good cause to terminate appellants' tenancy. In challenging the grant of the writ of recovery, appellants argue that (1) the findings are insufficient to support an eviction because there is no finding of material noncompliance with the lease, and (2) the record does not support a finding that good cause existed to terminate appellants' tenancy. Because a finding of material noncompliance is not required when a tenancy is terminated pursuant to 26 U.S.C. § 42, and because the record supports a determination of good cause, we affirm.

## FACTS

In November 1997, appellant Cynthia Washington signed a lease with respondent Cimarron Village for the rental of an apartment at the Kidder Park Townhomes (Kidder Park) in Rosemount, Minnesota. The complex is federally subsidized under 26 U.S.C. § 42 (2002) (section 42).[2] Under the lease, Washington agreed to reside at the unit with her three children and was informed of the numerous policies that Kidder Park residents must follow, including those set out in a document entitled "Community Policies."

The lease agreement provides, in relevant part, that (1) only persons listed as residents can live in the apartment, (2) residents will not allow other persons to occupy the apartment without approval from management, and (3) residents are responsible for the conduct of their guests or visitors on the property. The Community Policies provide, in relevant part, that (1) guests must use only the visitor parking area, (2) parking permits may be used only by leaseholders, and (3)

> [i]f any household receives 3 or more lease violations, they will be asked to leave Kidder Park [regardless of] the level or seriousness of the violation.

Under the terms of the lease, the tenancy can be terminated for (1) violations of the terms of the lease or the Community Policies; (2) police calls to an apartment for noise disturbances, domestic disputes, illegal substances, and other non-medical reasons; (3) allowing unauthorized people to reside in the apartment; and (4) "failure to pay the rent or late payment history."

Cimarron Village informed Washington in August 1998 that it did not intend to renew her lease. Washington challenged this decision, arguing that because her lease was for a federally subsidized housing unit, it could not be terminated without "good cause." This court agreed, reversed the district court's grant of summary judgment to Cimarron Village, and remanded for further proceedings. *Cimarron Village Townhomes, Ltd. v. Washington*, No. C3–99–118, 1999 WL 538110 (Minn.App.

---

1. In its order, the district court uses the term "writ of restitution." However, in 1998, the unlawful detainer statute was repealed and replaced with Minnesota Statutes chapter 504B, the current eviction statute. As a result of these changes, instead of referring to a "writ of restitution," the correct statutory term is "writ of recovery."

2. Under section 42 of the code, a developer may qualify for tax credits by making an extended low-income housing commitment. A developer first commits to a compliance period of 15 years, which is followed by an extended use period of at least 15 years or another period of time as agreed upon by the developer and the state agency. 26 U.S.C. §§ 42(h)(6)(D), (i)(I) (2002).

July 27, 1999).[3] In doing so, this court noted that

> 26 U.S.C. § 42(h)(6)(B)(i), with its reference to 26 U.S.C. § 42(h)(6)(E)(ii)(I)-(II), prohibits the eviction, except for *good cause*, of residents of any housing unit that is governed by an extended commitment agreement.

(Emphasis added.)

Sometime after this court's reversal of the attempted eviction of Washington, appellant Clyde Penny was added to the lease.[4] On January 31, 2002, appellants entered into a new lease, effective February 1, 2002. Less than two months later, appellants received a letter stating that the lease would be terminated on May 31, 2002, due to failure to pay rent. The letter, dated March 13, 2002, explained to appellants that they had exhausted the two late-payment allowances given to each household in a 12–month period. The letter also referred to Cimarron Village's concern about unauthorized people staying at appellants' residence. Cimarron Village subsequently rescinded this notice of eviction after appellants paid their rent.

On May 1, 2002, Cimarron Village sent to appellants a notice to vacate in 60 days, citing lease violations. The notice informed appellants that they were being asked to vacate the premises because (1) one Louis McCray was residing in the unit, in violation of the lease; (2) Artravis Washington, Washington's adult son, fraudulently obtained a parking permit; (3) appellants had exhausted their two allowable payment agreements and had continued to pay rent late; (4) appellants had received notice of many lease violations,

exceeding the allowable three per household; and (5) there had been repeated police calls to appellants' residence for more than four years. Appellants chose to remain in the residence and challenge the eviction. Cimarron Village filed an eviction action complaint on July 8, 2002.

At the July 31, 2002 hearing, Kristin Upton, site manager at Kidder Park from July 2000 to February 2002 and presently the director of property management at Gramercy Corporation, the management firm for Kidder Park, testified that the police had been at appellants' unit several times throughout their tenancy. Upton noted that Artravis, in particular, had been involved with the police on several occasions and that in July 2001, Artravis was baby-sitting for another resident in the complex when he allowed Rodney Davis, a friend of Artravis's family, into that other resident's home to use the bathroom. While he was there, Davis stole some blank checks from the resident's drawer and later cashed them at a grocery store. According to Upton, this conduct violated the complex's policy of requiring tenants to be responsible for the actions of their guests. Upton also testified that on April 17, 2002, Artravis was involved in an altercation with the police, which resulted in the police once again being called to appellants' home.

Upton testified that she had spoken to appellants in the past about having unauthorized people living in their unit and that while she gave appellants permission to have Louis McCray, a relative, stay with them over the Easter holiday, he was now residing with appellants, as was evidenced

---

**3.** The record before us is silent as to any further proceedings in district court as a result of the remand.

**4.** It is unclear from the record whether Clyde Penny was added to the lease before the new lease was signed on January 31, 2002, or contemporaneously with that signing.

by his own admission to the police. Finally, Upton testified that Artravis registered McCray's Pontiac Bonneville in order to get a parking permit and told her that he (Artravis) owned the vehicle. At the hearing, Artravis denied ever claiming to be the owner of the vehicle.

Sergeant James O'Leary of the Rosemount Police Department, testifying regarding the April 17, 2002 incident, stated that he observed Artravis driving a Pontiac Bonneville, knew that Artravis did not have a driver's license, activated his red lights to stop the vehicle, and pulled up beside Artravis. Artravis did not stop, but instead drove into the Kidder Park parking lot and ran into his apartment. Sgt. O'Leary testified that when he followed Artravis to the Washington residence, he spoke to a man who identified himself as Louis McCray, stated that he had just purchased the car, and said that he was staying in appellants' residence. Washington testified at the hearing that McCray never lived with them.

Officer Julie Rauenhorst testified that she is very familiar with appellants and the other residents of the apartment, that the police had made 40 contacts with appellants' apartment throughout the course of their tenancy, and that Artravis alone had been the subject of 22 contacts where either a citation was issued or a report was filed.

The district court granted a writ of recovery on August 2, 2002, concluding that the "lease was terminated for good cause, considering the totality of the circumstances." This appeal follows.

## ISSUES

I.  Should the term "material noncompliance" be incorporated into the meaning of "good cause," as applied in 26 U.S.C. § 42 (2002)?

II. Did Cimarron Village establish good cause for terminating appellants' lease on a federally subsidized unit?

## ANALYSIS

### I.

▮▮ Statutory construction of federal and state statutes is a question of law, which this court reviews de novo. *In re Estate of Jobe,* 590 N.W.2d 162 (Minn.App. 1999). Cimarron Village receives tax credits under 26 U.S.C. § 42 (2002) (section 42) for providing low-income units. A recipient of section 42 tax credits is prohibited from terminating a tenancy "other than for good cause." 26 U.S.C. § 42(h)(6)(E)(ii)(I). Here, the district court found that Cimarron Village had established good cause for terminating appellants' tenancy. Appellants argue, however, that because Minnesota courts have not defined the term "good cause," the term should be interpreted to mean that a landlord must show "material noncompliance" with the lease. While we agree that Minnesota courts have not established a bright-line definition of "good cause," we decline to equate that concept with "material noncompliance."

Appellants mistakenly rely on caselaw to argue that "material noncompliance" must be established before eviction from section 42 housing is permissible. In both *Oak Glen of Edina v. Brewington,* 642 N.W.2d 481, 485 (Minn.App.2002), and *Chancellor Manor v. Thibodeaux,* 628 N.W.2d 193, 196 (Minn.App.2001), this court concluded that the landlords could terminate the tenancy only upon a showing of the tenants' material noncompliance with the lease.[5]

---

**5.** The term "material noncompliance" with a lease is defined as follows:

    (1) One or more substantial violations of the rental agreement;

    (2) Repeated minor violations of the rental agreement that:

      (i) Disrupt the livability of the project,

Significantly, however, in neither of those cases did the tenant live in federally subsidized housing under section 42. *In Brewington,* the tenant lived in section 8 housing, and in *Thibodeaux,* the tenant lived in HUD-subsidized housing. *Brewington,* 642 N.W.2d at 483–84; *Thibodeaux,* 628 N.W.2d at 194. The distinction between section 8 or HUD-subsidized housing and section 42 housing is important because not all federally subsidized projects require a showing of material noncompliance with a lease before the landlord can terminate the tenancy.

Section 42 prohibits the eviction of tenants except for good cause. 26 U.S.C. § 42(h)(6)(E)(ii)(I). In contrast, the "material noncompliance" requirement derives not from any language in a statute, but from 24 C.F.R. § 247.3(a)(1) (2002), which provides that a landlord may not terminate

> (ii) Adversely affect the health or safety of any person or the right of any tenant to the quiet enjoyment of the leased premises and related project facilities,
> (iii) Interfere with the management of the project, or
> (iv) Have an adverse financial effect on the project;
> (3) If the tenant:
> (i) Fails to supply on time all required information on the income and composition, or eligibility factors, of the tenant household, as provided in 24 CFR part 5; or
> (ii) Knowingly provides incomplete or inaccurate information as required under these provisions; and
> (4) Non-payment of rent or any other financial obligation due under the rental agreement (including any portion thereof) beyond any grace period permitted under State law, except that the payment of rent or any other financial obligation due under the rental agreement after the due date, but within the grace period permitted under State law, constitutes a minor violation.
> 24 C.F.R. 247.3(c) (2001).

**6.** Under 24 C.F.R. § 247.3(a), a tenant in a "subsidized project" can also be evicted for "[m]aterial failure to carry out obligations

a tenancy in a subsidized project except upon a showing of material noncompliance with the lease.[6] In turn, 24 C.F.R. § 247.2 (2002) includes a list of "subsidized project[s]" that are subject to a "material noncompliance" requirement. The list includes certain tax-based subsidized programs and project-based programs under section 8 of 42 U.S.C. § 1437f (2002). It does not, however, include subsidized housing under section 42.[7]

While the drafters of 24 C.F.R. §§ 247.2 and 247.3 clearly intended to subject several federally subsidized projects to the material noncompliance requirement, they just as clearly, it seems to us, opted not to subject section 42 housing to that requirement. *See* 24 C.F.R. § 247.3 (stating that a landlord may not terminate any tenancy in a subsidized project except

under any state landlord and tenant act," certain criminal activity and alcohol abuse, or "other good cause."

**7.** *"Subsidized project"* is defined in 24 C.F.R. § 247.2 as

> a multifamily housing project (with the exception of a project owned by a cooperative housing mortgagor corporation or association) that receives the benefit of subsidy in the form of: below-market interest rates under section 221(d)(3) and (5), interest reduction payments under section 236 of the National Housing Act, or below market interest rate direct loans under section 202 of the Housing Act of 1959. For purposes of this part, subsidized project also includes those units in a housing project that receive the benefit of:
> (1) Rental subsidy in the form of rent supplement payments under section 101 of the Housing and Urban Development Act of 1965 (12 U.S.C. 1701s); or
> (2) Housing assistance payments for project-based assistance under Section 8 of the 1937 Act (42 U.S.C. 1437f). However, this part is not applicable to Section 8 project-based assistance under parts 880, 881, 883 and 884 of this title (except as specifically provided in those parts).

upon several grounds, including, but not limited to, material noncompliance and good cause); 24 C.F.R. § 247.2 (defining "subsidized project" to include section 8 and other programs, but omitting section 42). We cannot supply that which the drafters have declined to supply. *Nash v. Wollan*, 656 N.W.2d 585, 589 (Minn.App. 2003).[8]

Notwithstanding application of the good-cause standard, we are not insensitive to appellants' argument urging this court to establish a bright-line definition of that standard. Arguably, a bright-line definition of "good cause" could assist both landlords and tenants. We conclude, however, that such a definition would amount to second-guessing the language of section 42 and 24 C.F.R. §§ 247.2 and 247.3. Those sections demonstrate an intent not to require the same standards for eviction under all federally subsidized programs. Until Congress or the drafters of the federal regulations provide the courts with a specific meaning for "good cause," we believe the most prudent course for this court is to continue to determine "good cause" on a case-by-case basis.[9]

## II.

■ Having declined appellants' request to incorporate the term "material noncompliance" into the good-cause standard of section 42, or to establish a bright-line definition of the term "good cause," we now examine whether the district court erred in concluding that Cimarron Village

had good cause to terminate appellants' tenancy.

■ An eviction proceeding is civil in nature, and generally the only issue for determination is whether the facts alleged in the complaint are true. *Minneapolis Cmty. Dev. Agency v. Smallwood*, 379 N.W.2d 554, 555 (Minn.App.1985), *review denied* (Minn. Feb. 19, 1986). Therefore, our standard of review is whether the district court's findings of fact are clearly erroneous. *Id.*

The district court concluded that because appellants committed multiple violations of their lease agreement, the "lease was terminated for good cause, considering the totality of the circumstances." Although we agree with the conclusion that "good cause" to evict appellants is supported by adequate findings and sufficient evidence in the record, the district court erroneously included late rent payments as a factor supporting good cause, and we do not rely on that determination in affirming the district court decision.

■ Cimarron Village issued appellants an eviction notice in March 2002 for failure to make rent payments, but it later rescinded the notice after appellants paid the rent. Because Cimarron Village accepted the late rent payments, it waived its right to rely on this violation as grounds for eviction. *Oak Glen of Edina v. Brewington*, 642 N.W.2d 481, 486 (Minn. App.2002) ("Waiver has historically been an affirmative defense to an unlawful detainer action."). By accepting the late

---

**8.** We note that in a prior appeal to this court on the identical issue we now address, Washington argued that section 42 prohibited the eviction of a tenant without good cause. *Cimarron Village Townhomes, Ltd. v. Washington*, No. C3–99–118, 1999 WL 538110, *3 (Minn.App. July 27, 1999). This court agreed and reversed and remanded the matter on the ground that a tenant in section 42 housing can only be evicted for "good cause." *Id.* at

*6. It is appropriate that this court now apply the standard that appellant Washington previously urged this court to apply.

**9.** As a result of the discussion at oral argument, it appears that federal officials may have begun taking steps to provide a clear definition of "good cause" under the Code of Federal Regulations.

rent payments, Cimarron Village manifested its intent not to evict appellants for those late payments. *See id.* at 487. In order to rely on the late payments as a reason for eviction, Cimarron Village would have had to refuse a subsequent late payment. *Id.* There is no evidence, however, that appellants' made another late rent payment.

Notwithstanding the trial court's misplaced reliance on late rent payments, the remaining factors relied upon by the court amply support the "good cause" determination. Appellants' lease provides that a tenancy can be terminated for "police calls to an apartment for noise disturbances, domestic disputes, illegal substances and other non-medical reasons." The district court found that throughout appellants' tenancy, "approximately 40 police calls" had been made to their apartment, the latest occurring on April 17, 2002. This finding is supported by the testimony of Sgt. O'Leary and Officer Rauenhorst. We recognize that appellants originated some of the calls and that adverse action cannot be taken against tenants who call the police for their own health and safety. *See* Minn.Stat. § 504B.205, subd. 2(a)(2) (stating that a landlord cannot "impose a penalty on a residential tenant for calling for police or emergency assistance in response to domestic abuse or any other conduct"). A substantial number of the calls, however, originated from other sources.

The district court also found that even though the lease provides that a parking permit will be granted only for a vehicle owned by a tenant, Washington's adult son, Artravis, fraudulently obtained a parking permit by claiming that he was the owner of a vehicle registered to someone else. This finding is supported by Kristin Upton's testimony that Artravis claimed he owned the vehicle, and by Sgt. O'Leary's testimony that Louis McCray stated that he was the owner of the vehicle. While Artravis denies claiming to be the vehicle's owner, we defer to the district court's determination regarding the credibility of witnesses. *General v. General,* 409 N.W.2d 511, 513 (Minn.App.1987).

Consistent with the testimony of Sgt. O'Leary, the district court found that in July 2001, Artravis allowed Rodney Davis to enter the home of Artravis's neighbor while Artravis was baby-sitting her children. While there, Davis stole some blank checks and later cashed them at a grocery store. The district court found that this conduct violated the lease, which provides that residents are responsible for the conduct of their guests or visitors. Sgt. O'Leary's testimony and the terms of the lease support these findings.

The district court also found that "it is likely that Louis McCray was staying at the apartment without prior approval, in violation of the lease." This finding is supported by the language of the lease and by Sgt. O'Leary's testimony that when he followed Artravis to appellants' unit after the April 17 incident, McCray, who was in the apartment, stated that he was "staying" there. While appellants argue that McCray's statement that he was "staying" at appellants' apartment does not support a finding that he was living there in violation of the lease, the record supports the district court's determination that a violation was "likely." [10] Even if we were to place only slight reliance on this finding because of the inclusion of the qualifying word "likely," the district court's remaining findings are sufficient to support its

---

**10.** The record indicates that permission was given for McCray to visit over the Easter holiday. Easter in 2002 was on March 31; the conversation between McCray and Sgt. O'Leary occurred on April 17.

conclusion that appellants' tenancy was terminated for "good cause."

 The district court's findings regarding the numerous police calls, the inadequate supervision of a guest, the fraudulent application for a parking permit, and the likelihood of an unauthorized tenant, all which violated the terms of the lease, were not clearly erroneous. Appellants urge this court to treat each of these violations as a minor, isolated incident that should not be sufficient to terminate a tenancy in section 42 housing. This we cannot do. A landlord need only show "good cause" in order to terminate a tenancy in section 42 housing. Throughout their tenancy, appellants not only violated several of the lease's provisions, but they did so repeatedly. Unlike in the earlier successful appeal of appellants' prior eviction notice, Cimarron Village here provided extensive reasons for its termination of the lease. Those stated reasons were supported by testimony at the hearing. The district court properly concluded that the lease violations, considered as a whole, constituted good cause for termination of appellants' lease.

## DECISION

As a recipient of tax credits under 26 U.S.C. § 42 (2002), Cimarron Village need only show "good cause" before terminating appellants' tenancy. Here, the numerous lease violations committed by appellants throughout their tenancy, considered as whole, established the "good cause" necessary for Cimarron Village to terminate their tenancy.

**Affirmed.**