835 A.2d 158

**Rhonda CARTER**

v.

**MARYLAND MANAGEMENT CO.**

No. 7, Sept. Term, 2003.

Court of Appeals of Maryland.

Nov. 10, 2003.

Gregory Leo Countess (Hannah E.M. Lieberman and Sarah Glorian, Legal Aid Bureau, Inc., Baltimore), on brief for petitioner.

W. Michael Pierson (Pierson & Pierson, Baltimore, Howard Cassin and Donna M. Raffaele, Sagal, Cassin, Filbert & Quasney, P.A., Towson), on brief for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

In *Brown v. Housing Opportunities Comm.*, 350 Md. 570, 714 A.2d 197 (1998), we pointed out that the Real Property Article of the Maryland Code contains three separate and distinct provisions under which a landlord may recover possession of leased premises. Section 8–401 provides for the recovery of possession when the tenant fails to pay rent that is currently due and payable. Section 8–402—often referred to as the "tenant holding over" statute—permits recovery upon a finding that the tenant's lease has expired, that notice to quit was given, and that the tenant has refused to vacate. Section 8–402.1—referred to as the "breach of lease" statute—provides for recovery when the tenant has breached a covenant of the lease, other than the covenant to pay rent, and the court finds that the breach was substantial and warrants eviction.

The principal issue now before us is whether a landlord who is participating in the Federal Low–Income Housing Tax Credit (LIHTC) Program provided for in 26 U.S.C. § 42 may use the tenant holding over statute to evict a tenant who qualifies for and is receiving low-income housing assistance under the voucher program provided for in 42 U.S.C. § 1437f(*o*). The tenant here, petitioner Carter, contends that (1) provisions in 26 U.S.C. § 42(h)(6)(B) and (E) preclude a participating landlord from terminating a lease except for good cause, (2) the effect of that Federal preclusion is to make the tenancy an indefinite one, without any fixed term, (3) the lease therefore does not expire, regardless of whether, on its face, it has an expiration date or provides for expiration, and (4) as a result, the tenant holding over statute (§ 8–402) is inapplicable. She thus avers that, in order to terminate her tenancy, other than for nonpayment of rent, the landlord must proceed under the breach of lease provision (§ 8–402.1). Petitioner adds that, even if the preclusion does not convert a fixed tenancy into an indefinite one, the landlord failed to establish good cause in this case for terminating her lease.

The landlord—respondent Maryland Management Co.—argues that (1) except in one particular circumstance not applica-

ble here, the Federal law does *not* require "good cause" for termination, (2) even if it does, that does not convert a fixed-term tenancy into one that is indefinite or perpetual, (3) if the requisites of § 8–402 are met, the landlord may therefore proceed, in accordance with State law, under the tenant holding over statute, and (4) if good cause is required by Federal law to be shown under the tenant holding over statute, respondent produced sufficient evidence in this case to establish such cause. The District Court concluded that good cause was required, that that requirement did not preclude use of the tenant holding over statute, and that the landlord had established good cause. It therefore entered a judgment of restitution. The Circuit Court for Baltimore City affirmed, and so shall we.

## BACKGROUND

On October 1, 1996, petitioner leased a townhouse in a project owned by respondent. By reason of its participation in the LIHTC program, respondent agreed to lease a certain percentage of the rental units in the project to persons, such as petitioner, who qualified for low-income rental assistance under 42 U.S.C., § 1437f. The initial lease, for 1996–97, is not in the record, but an addendum to it is in evidence The addendum, on a U.S. Department of Housing and Urban Development form for the "Section 8 Tenant–Based Assistance Rental Voucher Program," notes that the lease ran from October 1, 1996 to October 1, 1997. It states that the "term of the lease" would terminate if (1) the lease terminates, (2) the housing assistance payment contract between the public housing agency and the landlord terminates, or (3) the housing agency terminates program assistance for the tenant. The "lease" would terminate upon termination by the landlord, the tenant, or both.

Paragraph 10 of the addendum expressly limited the grounds upon which the landlord could terminate the tenancy to "[s]erious or repeated violation of the terms and conditions of the lease; [v]iolation of Federal, State, or local law that imposes obligations on the tenant in connection with the

occupancy or use of the contract unit and the premises; [certain] [c]riminal activity [ ]; or [o]ther good cause." The term "other good cause" was defined in ¶ 10 c. as including, but not limited to, "living or housekeeping habits resulting in damage to the unit or property." Paragraph 11 required the landlord, as a condition of its terminating the lease, to give written notice to the tenant of the grounds for termination at or before the commencement of any eviction action. Whether this addendum, or one like it, accompanied subsequent leases is unclear. The record contains a lease for the term October 1, 2000 to October 1, 2001, but there is no addendum to it.

On September 4, 1998, a "Section 8 inspector" from the Baltimore City Housing Authority made an annual inspection of petitioner's home, in conformance with requirements of the program, and found seven violations. Petitioner was directed to patch and repaint a hole in the living room wall, clean a dirty kitchen floor and stove, clean stains in the bathtub, cover and repaint holes in two bedroom walls, clean walls or the floor in three bedrooms, and clean the carpet and floors throughout the unit. In June, 2000, respondent filed actions under both § 8–402 and § 8–402.1 to evict petitioner, but those cases were generally postponed pursuant to a settlement agreement.

The agreement allowed petitioner to remain in the home, but provided that, if she breached the lease prior to December 13, 2000, the landlord would provide notice of the breach and, within 30 days, the cases would be rescheduled for trial. If there was no request to reschedule by December 13, the cases would be dismissed. Although the agreement did not specifically call for a new lease, one was entered into on January 5, 2001. As we shall see, the Federal regulations relating to leases with voucher program tenants changed considerably between 1996 and 2000, and the new lease reflected those changes. The term was one year, commencing October 1, 2000, at the end of which period the parties could renew on a month-to-month basis. In addition to the renewal provision, there was a paragraph captioned "Tenant Holding Over," which provided, in relevant part, that if the tenant continued

to occupy the unit "after expiration of this Lease Agreement, or any renewal or extension thereof" and the landlord consented to such continued occupancy, the occupancy, unless agreed otherwise, would be on a month-to-month basis, at twice the rental payable under the lease, to continue until either party gave two months notice of termination. Included in the lease were certain rules and regulations, among which was a covenant by petitioner to "[k]eep the Premises in a neat, clean, good and sanitary condition."

The next annual inspection occurred in September, 2000. This time, one violation was noted; petitioner was directed to replace broken glass in the living room. In June, 2001, respondent sent notice to petitioner of its intent to terminate the lease when it expired. In August, another annual inspection occurred and turned up seven violations. Petitioner was directed to repair or replace the bathroom door and a bedroom door, clean and paint a bedroom wall, replace inoperable smoke detectors, clean and paint the walls on the steps, replace missing screens, and clean or replace all rugs. The lease expired, by its terms, on September 30, 2001 and, when petitioner failed to vacate the premises at that time, respondent filed another tenant holding over action but did not specify in its complaint any cause for termination other than expiration of the lease. When that case came to trial, petitioner argued that respondent could not terminate her tenancy absent a showing of good cause—something more than just termination of the lease. The District Court agreed and, noting that the June, 2001 notice failed to specify any such good cause, dismissed the case.

On December 28, 2001, respondent sent a notice declaring that the lease would be terminated on February 28, 2002. The letter stated that the lease would not be renewed because petitioner had failed to maintain her unit in a neat, clean, sanitary, and safe condition. It referenced the violations noted in the September, 1998, and August, 2001 inspection reports and indicated a lack of any evidence that those deficiencies had been corrected. At the same time, respondent informed the Housing Authority that it was terminating the

housing assistance contract that it had with respect to petitioner. When petitioner failed to vacate in accordance with the notice, respondent filed new actions under both § 8–402 and § 8–402.1. At trial, the various notices were admitted into evidence, along with testimony by the Housing Authority inspector, who confirmed the violations and stated that those directed to the landlord had been corrected but not those directed at petitioner. Petitioner acknowledged most of the conditions reported by the inspector. She said that respondent had repaired some of them and that she had tried to remedy others.

After listening to the evidence, the District Court found, from the various violations going back to 1998, that there was good cause for termination of the lease and that petitioner was a tenant holding over. Concluding that the tenant holding over statute was applicable, it entered judgment for restitution in favor of respondent under that statute and dismissed the action brought under the breach of lease statute. Petitioner appealed, arguing, as she does here, that (1) under Federal law, her lease was an indefinite one, without any fixed term, and that the tenant holding over statute was therefore inapplicable, and (2) respondent failed to establish good cause in any event. The Circuit Court found no merit to either argument and affirmed the District Court judgment.

## DISCUSSION

### The Good Cause Requirement

The issues here depend entirely on the effect that the Federal statutes (and implementing Federal regulations) have on State landlord-tenant law. There is no substantial dispute that, if respondent had not subjected petitioner's townhouse to the Federal low-income housing program by qualifying for the Federal tax credit under 26 U.S.C. § 42, and the issue were thus governed solely by Maryland landlord-tenant law, petitioner would, indeed, be a tenant holding over, and respondent would be entitled to use § 8–402 to have her evicted. The one-year term of the last lease had expired, the lease had been

converted by its terms into a month-to-month tenancy, and respondent had given the requisite 60–day notice to quit. It is critical, therefore, to understand the nature and requirements of the Federal statutes.

The statutory basis for the Federal low-income housing program is split between the tax code, 26 U.S.C. § 42, and the general program for assisted housing, 42 U.S.C., § 1437 *et seq.* Section 42 sets forth the eligibility criteria for the tax credit. The provisions in *title* 42 authorize the Secretary of Housing and Urban Development to enter into annual contributions contracts with public housing agencies in order to provide rental assistance payments to owners of certain dwelling units rented to approved low-income tenants. In conformance with statutory guidelines, the Secretary is to establish the maximum monthly rent the owner is entitled to receive for the units and the amount of rent that the tenants are required to pay, the latter being set as a percentage of the tenants' family income. The difference is made up by the government assistance payments. *See* 42 U.S.C. §§ 1437a and 1437f. For our purposes, the pertinent provision in title 42 is § 1437f—the current emanation of what began as Title I, § 8 of the National Housing Act of 1937—and, in particular, § 1437f(*o*), the § 8 voucher program.

Both sets of provisions— § 42 and § 1437f—are exceedingly long, complex, and convoluted, as befitting Federal programs in general and Federal tax laws in particular. Section 1437f and the regulations adopted pursuant to it have undergone many changes in just the past 20 years, and keeping up with the shifts in policy and approach is not easy. We shall begin with the tax provision, known as the Low Income Housing Tax Credit (LIHTC). It was enacted as part of the Tax Reform Act of 1986, as an effort to encourage the private development of low income housing.[1] Substantial amendments, relevant to

---

1. *See* Marc Jolin, *Good Cause Eviction and the Low Income Housing Tax Credit,* 67 U. Chi. L.Rev. 521, 524 (2000) (The LIHTC program was created, in part, to make it financially feasible for private developers to

the issue before us, were made as part of the Omnibus Budget Reconciliation Acts of 1989 and 1990.

Section 42 of title 26, coupled with § 38 of that title, provides a tax credit, usable ordinarily over a ten-year period, for a "qualified low-income housing project." Section 42(g)(1) defines such a project as one for residential rental property in which minimum enumerated percentages of the residential units are both rent-restricted and occupied by persons whose income does not exceed certain amounts. In its initial (1986) version, the law, through its definition of "qualified low-income building," required the building to remain part of a "qualified low-income housing project" during a 15–year "compliance period." *See* P.L. 99–514, § 252, enacting 26 U.S.C. § 42(c)(2) and (i), 100 Stat. 2191, 2199 (1986).

The 1989 amendment added a new subsection (h)(6) to § 42, in which was imposed the requirement of a further 15–year "extended use period." *See* P.L. 101–239, § 7108(c), 103 Stat. 2308–2311. With that amendment, § 42(h)(6)(A) makes clear that no credit is allowed with respect to a building unless an "extended low-income housing commitment," as defined in § 42(h)(6)(B), is in effect at the end of the taxable year. Thus, to qualify for the tax credit, the commitment must remain in effect for a "compliance period" of 15 taxable years, dating from the first taxable year of the credit period, and an "extended use period," which, subject to § 42(h)(6)(E), may not end earlier than 15 years after the close of the "compliance period." *See* § 42(i)(1) and (h)(6)(D). The effective commitment is thus, ordinarily, for 30 years.

Section 42(h)(6)(E) permits an early termination of the "extended use period" in two circumstances. If a mortgage on the building is foreclosed, the "extended use period" terminates on the date the building is acquired pursuant to the foreclosure. After the fourteenth year of the "compliance period," the owner may request the housing credit agency to

---

build and maintain low-income housing and help fill the void left by cuts in public housing and Section 8 rental subsidy programs.)

find a buyer for the taxpayer's interest in the low-income portion of the building, and, if the agency is unable to present a qualified contract for the acquisition of that portion by a person who will continue to operate it as a low-income building, the "extended use period" ends on the last day of that one-year period. *See* § 42(h)(6)(E)(i) and (I). Subsection 42(h)(6)(E)(ii) provides, however, that

> "[t]he termination of an extended use period under clause (i) shall not be construed to permit before the close of the 3–year period following such termination—
>
> (I) the eviction or the termination of tenancy (other than for good cause) of an existing tenant of any low-income unit; or
>
> (II) any increase in the gross rent with respect to such unit."

This provision, added as § 42(h)(6)(E)(ii) by the 1989 amendment, clearly applies only in the event of an early termination of the "extended use period" and is intended to protect existing low-income tenants, as to both their tenancy and the rent, for a three-year period. A new owner who acquires the building by virtue of a foreclosure or the existing owner who is allowed to terminate the commitment under § 42(h)(6)(E)(i)(II) may not evict or terminate the leases of low-income tenants, other than for good cause, or raise their gross rent beyond what is permitted during that three-year period.

The provision that lies at the heart of petitioner's indefinite tenancy argument is contained in § 42(h)(6)(B) which, as noted, defines the term "extended low-income housing commitment"—the commitment that must be in effect in order to entitle the owner to the tax credit. A brief explanation is required. Section 42(a) establishes the amount of the tax credit as "(1) the applicable percentage of (2) the qualified basis of each qualified low-income building." Section 42(c), in turn, defines the "qualified basis" of a "qualified low-income building" as an amount equal to "the applicable fraction" of "the eligible basis" for the building. The "applicable fraction"

is the smaller of the "unit fraction" or the "floor space fraction," each, itself, being a defined term. All of this relates to how the credit is to be calculated and, until the 1990 amendment to § 42(h)(6)(B) added by Congress in the Omnibus Budget Reconciliation Act of 1990 (P.L. No. 101–508, § 11,701, 104 Stat. 1388, 1388–506 (1990)), would have been quite irrelevant to what is now before us.

As budget reconciliation Acts tend to be, the 1990 Act was comprehensive in nature.[2] Title XI, which carried its own name, the Revenue Reconciliation Act of 1990, dealt with a variety of revenue provisions. Subtitle G, captioned Tax Technical Corrections, made a number of amendments to the Revenue Reconciliation Act of 1989, one of which effectively amended § 42(h)(6)(B)(i). That subparagraph stated one of the six criteria for an "extended low-income housing commitment." The amendment added the language noted below in italics:

> "For purposes of this paragraph, the term 'extended low-income housing commitment' means any agreement between the taxpayer and the housing credit agency—

> (i) which requires that the applicable fraction (as defined in subsection (c)(1)) for the building for each taxable year in the extended use period will not be less than the applicable fraction specified in such agreement *and which prohibits the actions described in subclauses (I) and (II) of subparagraph (E)(ii).*"

(Emphasis added).

■ Petitioner views that 1990 amendment as giving the restrictions in § 42(h)(6)(E)(ii) much broader effect and as mandating that an extended low-income housing commitment preclude, during both the compliance period and the extended use period, the eviction of a low-income tenant, other than for good cause. We believe that she is correct in her ultimate

---

2. The comprehensiveness of this statute is illustrated by the fact that the amendment at issue here was enacted by § 11,701 of the Act.

conclusion, but not just because of the 1990 statutory amendment.

In order to qualify for the tax credit under § 42, a landlord must comply with statutory requirements and requirements imposed by authorized regulations of the Secretary of Housing and Urban Development during both the initial compliance period and the extended use period. Section 1437f(d) and (o) require that contracts for assistance payments entered into by a public housing agency and the owner of existing housing units must provide, among other things, that "during the term of the lease, the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause." As we shall see, that requirement also appears in regulations of the Secretary. *See* 24 C.F.R. § 247.3, applicable generally to subsidized projects, and § 982.310, applicable to the voucher program in which petitioner participated.

The statutes relied upon by petitioner concern only the extended use period, first imposed by the 1989 amendment. As we observed, the "good cause" requirement for termination during the extended use period, as enacted in 1989, applied only in the event of early termination of that period, and was obviously intended to protect existing tenants for a minimum three-year period. The 1990 amendment broadened that requirement, however, and made it applicable throughout the entire extended use period, even if there was no early termination. That is clear both as a matter of ordinary statutory construction and from the legislative history of the 1990 provision. Respondent's view that the requirement remains applicable only to the three-year period following early termination makes no sense. The amendment would have been unnecessary for that purpose. The limited "grandfather" requirement applicable to early termination was already in the law. Placing the requirement in § 42(h)(6)(B)(i), even though it had no relevance to the "applicable fraction," which was the subject of § 42(h)(6)(B)(i), made it a condition of an "extended

low-income housing commitment" and thus of the landlord's entitlement to the tax credit.

The legislative history of the 1990 amendment clearly supports that intent. Although the technical correction provisions of the 1990 Act were posited by the Chairman of the House Ways and Means Committee, upon introduction of the legislation, as making "technical and clerical corrections" to the 1989 law in an effort "to make the language of the law understandable and clear" (*see* remarks of Congressman Rostenkowski, 136 Cong. Rec. H 7138, 101st Cong. 2nd Sess. Aug. 3, 1990), the Report of the House Ways and Means Committee notes that "[t]he bill *also* clarifies that the extended low-income housing commitment *must* prohibit the eviction or termination of tenancy (other than for good cause) of an existing tenant of a low-income unit or any increase in the gross rent inconsistent with the rent restrictions on the unit." (Emphasis added). 101 H. Rpt. 894 (Oct. 17, 1990). *See also* summary of the provisions of H.R. 5454 placed in the Congressional Record by Representative Rostenkowski upon introduction of the bill ("The bill clarifies that the extended low-income housing commitment must prohibit the eviction or termination of tenancy (other than for good cause) of an existing tenant of a low-income unit or any increase in the gross rent inconsistent with the rent restrictions on the unit"). 136 Cong. Rec. H 7138, *supra.* It is clear, therefore, that, both during the initial compliance period and during the extended use period, a landlord participating in the § 42 tax credit program may not terminate the tenancy of a low-income tenant other than for good cause. *See Cimarron Village v. Washington,* 659 N.W.2d 811 (Minn.App.2003); *Templeton Arms v. Feins,* 220 N.J.Super. 1, 531 A.2d 361 (1987).

### Effect on Tenant Holding Over Statute

The requirement of good cause is but one prong of petitioner's argument. The other is that the requirement gives to petitioner a right or entitlement to continued occupancy and thus effectively converts a fixed-term lease into an indefinite one that continues in existence and does not expire

until the end of the extended use period. This is based on the notion that, as good cause is required to terminate the tenancy, the tenancy cannot be terminated simply because the underlying lease expires. That second prong, indeed, is the linchpin of her argument that the tenant holding over statute is inapplicable because, until the expiration of the extended use period, she cannot be a tenant holding over. Consistently with our interpretation of 26 U.S.C. § 42, we agree with petitioner that her tenancy may not be terminated solely because of the expiration of her lease—that good cause is required to evict even as a tenant holding over—but we do not agree that she cannot be a tenant holding over, that the lease is one that continues indefinitely until the end of the extended use period.

At one time, the law may have supported petitioner's view of an indefinite lease. Prior to the consolidation of the certificate and voucher programs in a new § 1437f(o) in 1998, the leasing provisions governing those programs were contained in § 1437f(d)(1)(B), which provided, in relevant part, that (1) the lease between owner and tenant had to be for at least one year "and shall contain other terms and conditions specified by the Secretary," and (2) the owner could not "terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause." Section 1437f(d)(1)(B)(iii) through (v) listed certain conduct that would be cause for termination.

In 1995, the Secretary adopted new regulations for the certificate and voucher programs. *See* 60 FR 34660 (July 3, 1995) adopting new 24 C.F.R. § 982.309. Those regulations required the lease to be for an initial term of at least one year and to provide either "[f]or automatic renewal for successive definite terms (e.g., month-to-month or year-to-year); or . . . [f]or automatic indefinite extension of the lease term." § 982.309(b)(1) and (2). It provided that the term of the lease would terminate if the owner, the tenant, or the two together terminated the lease, but stated that, during the term of the lease, the owner could not terminate the lease except for good

cause. §§ 982.309(b)(3), 982.310(a). In proposing those regulations, the Department noted that they were intended merely to "confirm and clarify" the existing principle that "the tenancy continues automatically after the end of the initial lease term" and that "[t]here is no need or requirement for the parties to execute a new lease or lease extension" as "[t]he automatic extension is provided for in the lease originally executed by the landlord and family." 58 FR 11292 (Feb. 24, 1993). It continued:

> "The difference between an automatic indefinite extension and an extension for pre-defined definite terms is only a difference of form. For all program tenancies, the owner may only terminate the tenancy for statutory good cause grounds, whether during the course of the initial or extended term, or at the end of the initial or any extended term. In this respect, tenancies in the Section 8 tenant-based programs differ from private unassisted tenancies, where the owner may typically evict the tenant without cause at the end of the lease term. *In the tenant-based Section 8 programs, simple expiration of the lease term is not grounds for termination of tenancy.*"

*Id.*

Under that regime, most of the few courts that considered the matter concluded that the requirement of good cause applied not only during the term of the lease but after the lease expired—that it governed as well the decision whether to renew or extend the lease. In *Swann v. Gastonia Housing Authority*, 502 F.Supp. 362, 365 (W.D.N.C.1980), *aff'd in part*, 675 F.2d 1342 (4th Cir.1982), the District Court observed:

> "The purpose of the Act would be frustrated if a landlord were allowed to participate in and take advantage of the economic security provided to landlords under the Act, and yet the tenant were stripped of any reciprocal security by being vulnerable to eviction without good cause at the expiration of the lease term. Congress could not have intended such unfairness and insecurity in an area as critical for low-income families as is basic housing."

That aspect of the decision was affirmed by the Fourth Circuit Court. *See* 675 F.2d at 1345.

A Federal court in California reached a similar conclusion, on a somewhat more precise basis. In *Mitchell v. U.S. Dept. of Housing & Urban Develop.,* 569 F.Supp. 701, 707–08 (N.D.Cal.1983), the court noted that the limitation in § 1437f(d) was on a termination of "the tenancy," not termination of "the lease." It concluded that, "[i]f Congress had intended the good cause requirement to be applicable only to mid-lease evictions, it could have easily selected the phrase 'terminate the lease.'" Applying the good cause requirement to non-renewals following expiration, the court said, "is not onerous, but merely fair." *Id.* at 709. *See also Templeton Arms v. Feins, supra,* 220 N.J.Super. 1, 531 A.2d 361; *Cimarron Village v. Washington, supra,* 659 N.W.2d 811; *Joy v. Daniels,* 479 F.2d 1236 (4th Cir.1973). We intimated as much, although the issue was not directly before us, in *Carroll v. Housing Opportunities Comm'n,* 306 Md. 515, 510 A.2d 540 (1986). The issue there was whether a § 8 tenant, who challenged a tenant-holding-over action, had sufficiently alleged a controversy involving more than $500 to entitle her to a jury trial. Noting the good cause requirement in the Federal regulations, we concluded that she "has a right to remain in her townhouse indefinitely until the Commission can establish good cause for eviction" and that that right of continued tenancy, coupled with the rent subsidy, caused the value of the controversy to exceed $500. *Id.* at 525, 510 A.2d at 545. *Compare Whitehall Manor Properties, Inc. v. Lamothe,* 13 Mass.App.Ct. 917, 430 N.E.2d 852 (1982) (holding that the Federal procedures "apply only when the lease is in effect").

The statutory and regulatory regime changed significantly in 1998, however, when Congress consolidated the certificate and voucher programs in a new § 1437f(*o*). In place of the lease requirements of § 1437f(d), the new programs became subject to § 1437(*o*)(7) which, after requiring a one-year initial lease (unless the public housing agency approves a shorter term), provides that the lease shall (1) be "in a standard form

used in the locality by the dwelling unit owner," (2) "contain terms and conditions that—(I) are consistent with State and local law; and (II) apply generally to tenants in the property who are not assisted under this section," and (3) "provide that during the term of the lease, the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause." (Emphasis added). *See* P.L. 105–276, 112 Stat. 2461, 2599. Those are the current provisions.

In conformance with that statutory change, the applicable regulations were also significantly rewritten. *See* 64 FR 26632 (May 14, 1999). They continue to require an initial lease of one year, unless the public housing agency approves a shorter term, but gone are the provisions requiring automatic renewal. They are replaced by the new provisions in § 982.308 requiring the lease to conform with standard leases in the community and with State landlord-tenant law. As the Department advised in proposing these new regulations, "[t]he lease form must be in the standard form used in the locality by the owner" and "must contain terms that are consistent with State and local law, and that apply generally to unassisted tenants in the same property." 64 FR 26632, *supra.*

The pre–1998 version of § 1437f, and the regulations implementing it, were far more consistent with the post–1990 structure of the tax credit provision in establishing that good cause was required to terminate the tenancy of a voucher program tenant, whether during the term of a lease or upon its expiration. Whether they would have gone further and supported the notion of an indefinite tenancy is a moot point now, as the provisions in the old law that may have supported that proposition have been deleted in favor of the requirement that voucher program leases be consistent with leases generally used in the community, leases, like the one in this case, that ordinarily carry fixed expiration dates and that permit eviction under the State tenant holding over law. The new, current, provisions clearly militate against the notion of an indefinite tenancy—a never-ending lease.

■ We do not believe that the new provisions were intended, or effective, to delete the requirement that decisions not to renew or extend a lease upon its expiration require good cause, however. For one thing, that would place § 1437f(*o*) in conflict with 26 U.S.C. § 42 which, as we noted, precludes both the "eviction" and the "termination of tenancy" of existing low-income tenants other than for good cause. The two sections are part of an integrated statutory scheme, and, as we have often said, "a provision contained within an integrated statutory scheme must be understood in that context and harmonized to the extent possible with other provisions of the statutory scheme." *Balto. Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 157, 501 A.2d 1307, 1313 (1986), and cases cited there. *See also Baltimore v. Chase,* 360 Md. 121, 129, 756 A.2d 987, 992 (2000); *Liverpool v. Baltimore Diamond,* 369 Md. 304, 327, 799 A.2d 1264, 1278 (2002); *State v. Ghajari,* 346 Md. 101, 115, 695 A.2d 143, 149 (1997), quoting from *State v. Harris,* 327 Md. 32, 39, 607 A.2d 552, 555 (1992) ("We presume that the legislature intends its enactments 'to operate together as a consistent and harmonious body of law.' ").

Such a construction is also more consonant with the Congressional intent. Although the changes to § 1437f were certainly intended to allow landlords more flexibility and to bring some aspects of the voucher program more in line with both private residential leasing practices and with State landlord-tenant law, we do not believe that they were intended to subject voucher tenants to the arbitrary whims of landlords who are reaping a significant tax advantage from the program. If we were to conclude that the good cause requirement applies only to mid-term evictions and not to renewal decisions, the program would lose substantial stability, as tenants could be evicted for no reason at the end of a one-year lease or at any time thereafter on 60 days notice. That would hardly be consistent with the declared Congressional purpose of "aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." § 1437f(a).

The two statutes can easily be read harmoniously, with each other and with the overall Congressional purpose. We hold

that, whatever term may be stated in the lease, a voucher program tenant may not be evicted by a landlord who has qualified for a § 42 tax credit and is continuing to receive rent subsidies, either during the term of the lease or at the expiration of that term, except for conduct or circumstances that qualify under the Federal law as good cause. We hold further, however, that neither § 42 nor § 1437f(*o*), as currently worded, preclude use of the State tenant holding over statute as a procedural mechanism to remove a tenant who is, indeed, holding over after the expiration of the term of his/her lease. To succeed under that statute, the landlord must comply with its terms and conditions *and* establish good cause for refusing to renew the tenancy.

### *Existence of Good Cause*

 We thus come to the final question of whether respondent established sufficient facts to constitute good cause for its decision to terminate petitioner's month-to-month lease. Under Maryland Rule 8–131(c), we review the case on both the law and the evidence but do not set aside the judgment on the evidence unless the judgment is clearly erroneous, giving due regard to the ability of the trial court to judge the credibility of the witnesses.

As we have indicated, the HUD regulations, 24 C.F.R. § 982.310(d), provide a non-exclusive list of conduct or circumstances that might establish good cause for terminating a lease. Among them is "[a] family history of . . . destruction of property, or of living or housekeeping habits resulting in damage to the unit or premises." In this case, the Housing Authority inspector found petitioner's residence to be plagued with various maintenance problems—foul odors, apparently from a cat, holes in several walls, apparently caused by petitioner's children, dirty floors, walls, and kitchen appliances, inoperable smoke detectors, missing or torn screens— some of which dated back to 1998, only two years after she commenced occupancy. Petitioner admitted to most of the problems, and the court found them to exist. We do not find its ruling to be clearly erroneous.

JUDGMENT OF CIRCUIT COURT AFFIRMED, WITH COSTS.