REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2054

September Term, 2013

---

LaSHAUN KIRK

v.

HILLTOP APARTMENTS, LP

---

Krauser, C.J.,
Berger,
Moylan, Charles E., Jr.
  (Retired, Specially Assigned),

JJ.

---

Opinion by Krauser, C.J.

---

Filed: September 30, 2015

LaShaun Kirk, appellant, has leased, for a number of years, a unit in a federally subsidized housing complex owned by appellee, Hilltop Apartments, LP. In March 2013, Hilltop notified Kirk that, because of numerous leasehold violations, it was terminating her lease effective April 12, 2013, and directed her to vacate the apartment by that date. When she did not do so, Hilltop filed a breach-of-lease action in the District Court of Maryland for Prince George's County seeking repossession of the property. Kirk, in turn, demanded a jury trial, claiming that the amount in controversy exceeded $15,000, the threshold sum for such a proceeding,[1] and the case was thereafter transferred to the Circuit Court for Prince George's County, as requested.

Hilltop then filed a motion to strike Kirk's jury demand, contending that the amount in controversy was, in fact, less than $15,000 and that, therefore, the District Court had exclusive jurisdiction over the matter. The circuit court agreed and, struck Kirk's demand for a jury trial, and remanded the case to the District Court for trial. From that ruling, Kirk noted this appeal.

---

[1] The Maryland Declaration of Rights, Article 23, provides that, "[t]he right of trial by Jury of all issues of fact in civil proceedings in the Courts of Law in this State, where the amount in controversy exceeds the sum of $15,000 shall be inviolably preserved." Accordingly, although an action to recover possession of residential property based on a breach of lease must be filed in the District Court of Maryland, *see* § 8-402.1(a) of the Real Property Article and § 4-401(4) of the Courts & Judicial Proceedings Article of the Maryland Code, where the "amount in controversy" exceeds $15,000, a party to the proceeding may invoke the right to a jury trial in the circuit court by filing a timely demand for the same. *See* Real Property, § 8-601 and Md. Rule 3-325.

This appeal raises the question of how the "amount in controversy" is to be calculated in disputes of this nature. A party to a landlord-tenant action may request a jury trial where "either" the claim for "money damages" or "the value of the right to possession" of the leased premises is over $15,000. *Bringe v. Collins,* 274 Md. 338, 347 (1975). Because neither party asserted a claim for money damages, the only issue before us is whether Kirk's right to possession of the leased premises exceeds $15,000. If it does, Kirk's demand for a jury trial should not have been struck by the circuit court.

Kirk reasons that, because her lease, by its express terms, automatically renews for successive one-year terms unless terminated for good cause, she has a right to possess the apartment for an "indefinite period of time" and, thus, the value of her right to possess the premises should have been calculated by multiplying the annual fair market rental payment by the number of years of her remaining estimated life expectancy, the product of which, it is undisputed, exceeds $15,000. The circuit court, however, rejected Kirk's claim of what it described as an "indefinite tenancy or a never-ending lease" and endorsed, instead, the approach advocated by Hilltop, that is, that the value of Kirk's right to possess the premises should be calculated, not by multiplying her annual rent by her estimated life expectancy, but by multiplying her monthly rental payment by the number of months that remained on her current lease, which was due to expire on December 31, 2013 (approximately nine months after Hilltop notified Kirk that it was terminating the lease). In accordance with that conclusion, the court then multiplied the apartment at issue's monthly fair market rent of

2

$1,412 by the remaining months of her lease term and found that the value of Kirk's right to possession of the premises was $12,708, and hence the amount in controversy was less than that required for a jury trial.

For the reasons set forth below, we believe that the method of computation proposed by Kirk was the correct approach to this issue, and, therefore, we reverse the circuit court's order striking Kirk's demand for a jury trial and remanding this case to the District Court.

*The Lease* [2]

Hilltop and Kirk executed a "Model Lease For Subsidized Programs" (a form lease issued by the United States Department of Housing and Urban Development), in which Hilltop agreed to lease to Kirk a two-bedroom apartment in a federally subsidized "project-based" Section 8 housing development located in District Heights.[3] The earliest lease between the parties that is in the record before us provided that the "initial term of this Agreement" would "begin on January 1, 2010 and end on December 31, 2010." At the

---

[2] The parties executed a "Model Lease" using "Form HUD-90105-a 12/2007." The same lease form, which includes the notation "OMB Approval No. 2502-0204 (Exp. 06/30/2017)," can be found on the United States Department of Housing and Urban Development's ("HUD") website.

A statement on the bottom of page 9 of the Model Lease states that property "[o]wners are *required to use the HUD model lease* which includes terms normally covered by leases used in the housing rental industry plus terms required by HUD for the program under which the project was built and/or the program providing rental assistance to the tenants." (Emphasis added.)

[3] The lease was actually between Kirk, as tenant, and "Woodland Springs," as landlord. Hilltop Apartments, LP, traded as Woodland Springs and, as the parties do here and have done below, we refer to the landlord as "Hilltop."

conclusion of this "initial term," the Agreement was to "continue for successive terms of one year each unless automatically terminated as permitted" under the terms of the agreement. But if the landlord wished to terminate the lease, it had to do so "in accordance with HUD regulations, State and local law," which among other things, meant that it had to provide the tenant with a "termination notice" specifying the date of termination and the reasons the landlord was terminating the agreement. After listing ten grounds upon which the landlord could terminate the tenancy, the lease then stated that the landlord could also terminate the agreement for "other good cause." Such a termination could only occur, however, "as of the end of any initial or successive term."

After Kirk's initial lease term ended, her lease was renewed for successive one-year terms. A second lease, utilizing the same "Model Lease For Subsidized Programs" (Form HUD-90015-a 12/2007), was executed by the parties for the time period from January 1, 2012 through December 31, 2012, and, as in the earlier 2010 lease, it provided that "the Agreement will continue for successive terms of one year each unless automatically terminated as permitted" for "good cause." Although it does not appear that a subsequent Model Lease was executed for the lease term running from January 1, 2013 to December 31, 2013, there is no indication in the record that either party terminated the lease, and the parties do not dispute that the 2012 agreement did, in fact, continue for another one-year term.

## *The Breach of Lease*

A letter from Hilltop dated March 7, 2013, notified Kirk that Hilltop was terminating her "Lease Agreement dated January 11, 2012."  The letter explained that Hilltop was terminating Kirk's lease, effective April 12, 2013, because she had "materially breached" her lease by "allowing a fire to damage" her apartment; by failing to reimburse Hilltop for that damage; by permitting her guests to engage in "criminal activity" on the premises; by failing to maintain the apartment and surrounding common areas; and by "disturbing the peace and comfort" of her neighbors in the apartment building.

Specifically, the letter alleged that the apartment was damaged by a fire when the stovetop was left on and unattended; that Kirk had not reimbursed Hilltop the $3,847.30 for that fire damage; that children "occupying" her apartment "were lighting matches and allowing them to burn holes in the staircase to the common area"; that, upon inspection of her apartment, Hilltop discovered "broken blinds, broken door knobs, missing sprinkler covers, and buckling walls"; that other Hilltop residents had "submitted regular complaints of noise and heavy traffic of non-residents coming from" her apartment; that "security and police have visited the property on reports of illegal activity, including use of marijuana"; that an "altercation involving a knife and a baton" occurred in her apartment that "led to significant injury" to some of her guests and that one or more of them had been "sent to the hospital for bleeding from the head and abdomen"; and finally, that, on one occasion, there were "loud, verbal arguments" between her guests.

5

As noted, when Kirk refused to vacate her unit, Hilltop filed a breach-of-lease action in the District Court seeking repossession of her apartment. In response, Kirk demanded a jury trial and the case was transferred to the Circuit Court for Prince George's County where Kirk filed an Answer to the complaint in which, among other things, she denied that she had breached the lease and maintained that her eviction was unwarranted. Hilltop then moved to strike the jury trial request and to have the case remanded to the District Court for trial, on the grounds that the amount in controversy was less than the requisite $15,000 needed for a jury trial in the circuit court.

### The Hearing

On November 6, 2013, the circuit court held a hearing on Hilltop's motion to strike Kirk's demand for a jury trial. At that hearing, the parties agreed that, in a landlord-tenant action involving federally subsidized housing, the value of a tenant's right to possession of the leased premises is determined by multiplying the fair market monthly rental payment for the housing unit by "the time period for which the tenant has a right to continued possession" of the premises. *See Carroll v. Housing Opportunities Commission*, 306 Md. 515, 525 (1986). The parties also agreed that the fair market rental value of Kirk's apartment was $1,412 per month and that that figure should be multiplied by the remaining months of the tenancy to determine the value of Kirk's right to possession of the leased premises and, hence, the "amount in controversy." The parties disagreed, however, as to the period of time for which Kirk had "a right to continued possession" of the apartment.

6

Hilltop asserted that Kirk was entitled to possess the property only until the current lease term expired on December 31, 2013. Accordingly, Hilltop claimed that the amount in controversy was $12,708, that is, $1,412 times the nine months remaining before Kirk's present lease term expired. Kirk disagreed, maintaining that, because her lease automatically renewed for successive one-year terms (unless terminated for "good cause"), she was entitled to remain in possession of the property indefinitely and, therefore, the $1,412 fair market rental payment should be multiplied by the remainder of her projected lifespan. She then pointed out that she, who was then 42 years old, needed to live only an additional eleven more months (which was just two months more than her current lease term) for the value of her right to possession of the apartment to exceed $15,000.

In support of her position, Kirk invoked the Court of Appeals decision in *Carroll, supra,* and its subsequent decision in *Cottman v. Princess Anne Villas*, 340 Md. 295 (1995), both of which had endorsed her method of calculating the amount in controversy. Hilltop responded by claiming that, because of changes in the federal subsidized housing regulations enacted in the late 1990s, *Carroll* and *Cottman* were no longer applicable, but that a later case, *Carter v. Maryland Management Co.*, 377 Md. 596 (2003), where Hilltop claimed the Court of Appeals reached a contrary conclusion, was. The circuit court agreed with Hilltop that *Carter* was controlling and, based on its interpretation of that case, ruled that Kirk did not have an "indefinite tenancy or a never-ending lease" and, therefore, it adopted Hilltop's method of calculating the amount in controversy in this case.

7

The parties on appeal make the same arguments they did below, that is, Kirk contends the correct method of determining the value of her continued right to possession of the leased premises is to multiply the yearly fair market rent by the expected number of years comprising her remaining lifespan. That is the correct method of calculation, Kirk maintains, because, until a court determines that her landlord has good cause to evict her, she has the right "to possess her home indefinitely." As she did in the circuit court, Kirk relies on *Carroll, supra,* and *Cottman, supra,* in support of her position. Hilltop maintains, however, that *Carroll* and *Cottman* have been superseded by *Carter*, which it claims, in effect, resolves this issue in its favor.

The issue before the Court of Appeals in *Carroll* was whether the circuit court erred in determining that a tenant of a federally subsidized housing complex had not satisfied the "amount-in-controversy" required for a jury trial after her landlord had instituted a "tenant-holding over action" in the District Court of Maryland.[4] The Court of Appeals began its analysis by observing that, "in determining the value to the tenant of remaining in possession, one must consider" the "fair market rent for comparable housing in the area" and "the time period for which the tenant has a right to continued possession." *Id.* at 525. The Court of Appeals then explained that, "[w]hile the lease states that the tenancy is month to

---

[4] *See* § 8-402 of the Real Property Article of the Md. Code.

8

month, under applicable [federal] regulations and case law, [the tenant] has a right to remain in her townhouse indefinitely until the [landlord] can establish good cause for eviction." *Id.* Thus, "the value of this potential flow of future federal rent subsidies," declared the Court, was a "critical factor" in calculating the amount in controversy. *Id.* Then, after noting that other "courts have computed the value of the right to occupy federally subsidized housing over the tenant's remaining life span, or a least over a period of years," the Court of Appeals adopted that method of computation and found, using that approach, that "[t]here can be no doubt that . . . the value of [the tenant's] right to possession" exceeded the amount in controversy necessary for a jury trial and reversed the circuit court. *Id.* at 527.

Nine years later, the Court of Appeals in *Cottman, supra,* "reaffirm[ed]" that "the amount in controversy in an action for possession of leased premises is determined by the fair market rent for the period of possession involved in the controversy," 340 Md. at 297, and that, the period of possession, where the lease automatically renews unless otherwise terminated for good cause, is the tenant's remaining lifespan. *Id.* at 299. In sum, *Carroll* and *Cottman* clearly support Kirk's position that, when calculating the amount in controversy in this case, the correct approach to determining the value of her right to possession of her federally subsidized apartment is to multiply the yearly fair market rent by the number of years comprising Kirk's remaining life span. Hilltop, however, disagrees and, as noted earlier, suggests that the Court of Appeals' more recent decision in *Carter, supra,* disapproved, at least implicitly, the holdings of *Carroll* and *Cottman*.

9

In *Carter*, the Court of Appeals addressed whether a landlord participating in the Federal Low-Income Housing Tax Credit Program may use Maryland's tenant-holding-over statute to evict a tenant receiving low-income housing assistance under HUD's voucher program under 42 U.S.C. § 1437f(o). 377 Md. at 598. Generally, the tenant-holding-over statute, Real Prop., § 8-402, permits a landlord to recover possession of leased property upon finding that the tenant's lease has expired, that notice to quit was given, and that the tenant has refused to vacate. *Id.* at 598. Rhonda Carter, the tenant in this case, argued that she was not a tenant holding over because the duration of her lease was "indefinite," given the fact that federal regulations prohibited the landlord from terminating the lease absent "good cause." *Id.*

At issue in *Carter* was a townhome, leased to Carter, in a project owned by Maryland Management Company as part of the "Section 8 Tenant-Based Assistance Rental Voucher Program." *Id.* at 599. In 2001, several years after certain federal regulations relating to the requirements for terminating leases under the *voucher* program were changed, Carter entered into a new lease with her landlord. That lease had a one-year lease term, which was renewable thereafter on a month-to-month basis. *Id.* at 600.

Upon discovering that Carter had violated certain provisions of the lease agreement, the landlord sent Carter notice that it intended to terminate the lease. *Id.* at 601. When Carter failed to vacate the home, the landlord filed, in the District Court of Maryland, both

10

a breach-of-lease action under Md. Code, Real Prop. § 8-402.1 and a tenant-holding-over suit under Real Prop. § 8-402. *Id.* at 602. After finding that there was good cause for termination of the lease and that Carter was, in fact, a tenant holding over, the District Court entered judgment in favor of the landlord under the tenant-holding-over statute. *Id.*

Carter sought review of that decision by the Circuit Court for Baltimore City, contending that her lease term was indefinite and without any fixed term, that the tenant-holding-over statute was therefore inapplicable, and that her landlord, in any event, had failed to establish "good cause" to terminate her tenancy. *Id.* at 602. Finding no merit to either of these contentions, the circuit court affirmed, *id.* at 602, whereupon Carter petitioned the Court of Appeals for writ of certiorari, which that Court granted.

While acknowledging that a landlord participating in the federal low-income tax credit program could "not terminate the tenancy of a low-income tenant other than for good cause," *id.* at 608, the Court of Appeals rejected the argument that the "good cause" termination requirement gave Carter "a right or entitlement to continued occupancy" of the housing unit and thereby "effectively convert[ed] a fixed lease term into an indefinite one that continues in existence and does not expire." *Id.* at 609. The Court, relying on 1998 statutory and regulatory changes which "consolidated the certificate and voucher programs in a new [42 U.S.C.] § 1437f(o)," *id.* at 611, noted that, although the federal regulations "continue to require an initial lease of one year . . ., *gone are the provisions requiring automatic renewal*."

11

*Id.* at 612 (emphasis added). Indeed, there are new provisions, the Court pointed out, "requiring the lease to conform with standard leases in the community and with State landlord-tenant law." *Id.* Accordingly, the Court concluded:

> Whether [the pre-1998 version of § 1437f, and the regulations implementing it] would have gone further and supported the notion of an indefinite tenancy is a moot point now, as the provisions in the old law that may have supported that proposition have been deleted in favor of the requirement that voucher program leases be consistent with leases generally used in the community, leases, like the one in this case, that ordinarily carry fixed expiration dates and permit eviction under the State tenant holding over law. The new, current, provisions clearly militate against the notion of an indefinite tenancy—a never ending lease.

*Id.* at 612.

In ruling on Hilltop's motion to strike Kirk's demand for a jury trial on the grounds that the amount in controversy was less than $15,000, the circuit court determined that *Carter* was "binding" and, in accordance with that decision, concluded that Kirk did not have "an indefinite tenancy or a never-ending lease" and, therefore, the amount in controversy was less than $15,000. The circuit court's reliance on *Carter*, however, was misplaced. *See McDaniel v. Baranowski,* 419 Md. 560, 574 (2011) (the "legal relationship between landlord and tenant is governed by the contract between the parties, as well as by any statutory authority.").

As noted, the parties executed a "Model Lease For Subsidized Programs" – a form lease HUD issued in 2007. In fact, as stated on the lease itself, the property owner was "*required to use the HUD model lease* which includes terms normally covered by leases

12

used in the housing rental industry plus terms required by HUD for the program under which the project was built and/or the program providing rental assistance to the tenants." (Emphasis added.)

Paragraph two of the Model Lease stated:

The initial term of this Agreement shall begin on January 01, 2012 and end on December 31, 2012. **After the initial term ends, the Agreement will continue for successive terms of one year each unless automatically terminated** as permitted by paragraph 23 of this Agreement. [5]

(Emphasis added.)

Later on in that lease, Paragraph 23 addressed "Termination of Tenancy," stating that "[a]ny termination of this Agreement by the Landlord must be carried out in accordance with HUD regulations, State and local law, and the terms of this Agreement." The lease then listed ten specific reasons for which the lease could be terminated, including the tenant's "material noncompliance with the terms" of the lease agreement and the tenant's (or the tenant's household member or guest's) engagement in criminal activities in or near the premises. Finally, it provided that the lease could be terminated, "effective as of the end of the initial or any successive term," for "other good cause."

It is thus clear that Kirk's lease had no expiration date, but instead, would automatically renew for "successive one year terms," unless good cause for ending the lease

---

[5] The parties had previously executed the same model lease that provided for an initial term beginning on January 1, 2010 and ending on December 31, 2010, and that would "continue for successive terms of one year each unless automatically terminated[.]"

13

could be shown.  Hence, Kirk, unlike Carter, had what amounted to a continuing right to possession of the premises for an indefinite period of time.  This alone sinks Hilltop's claim that *Carter* requires us to affirm the court below.

But if that were not enough, we note that, in rejecting the notion of an "indefinite tenancy" in *Carter*, the Court of Appeals relied upon changes to the subsidized housing regulations that were enacted in the late 1990s and concluded that, while the federal regulations "continue to require an initial lease of one year . . ., *gone are the provisions requiring automatic renewal*."  377 Md. at 612 (emphasis added).  That observation, while perhaps applicable to the *tenant-based voucher* program at issue in *Carter*, is not relevant to the *project-based* housing program here, as Kirk's lease – on a standard form issued by HUD four years after *Carter* was decided – does, in fact, expressly provide for automatic renewal of the lease term.

And that is the conclusion that we recently reached in *Grady Management, Inc. v. Epps*, 218 Md. App. 712 (2014), a case that also addressed a landlord-tenant dispute involving a *project-based* federal housing program.  *Id.* at 716 n. 2.  In that case, a "model lease" was executed between a tenant and a property owner for a unit in a subsidized apartment project regulated under the Section 8 New Construction Program. *Id.*  As Kirk's lease did, the lease between the property owner and the tenant, Jesse Epps, provided that, "[a]fter the initial term ends, the Agreement will continue for successive terms of one Year each unless automatically terminated as permitted by paragraph 23 of this Agreement."  *Id.*

14

Paragraph 23 of that lease then set forth the same grounds for termination as those that appeared in Kirk's model lease, including termination for the tenant's "material noncompliance" with the lease terms or for "other good cause." *Id.* at 716-717.

When the landlord filed a "tenant-holding-over" action in the District Court seeking to evict Epps, Epps demanded a jury trial, whereupon the matter was transferred to the Circuit Court for Montgomery County. *Id.* at 719. The circuit court ultimately granted Epps's motion for summary judgment, agreeing with him that the tenant-holding-over statute did not provide a legal basis for evicting him because his lease had no "definite term" and it could only be terminated for good cause. *Id.* at 720. The landlord appealed and we affirmed.

After stressing that "the differences in the federal leasing programs and the leases involved in *Carter* and in [*Grady Management v. Epps*] are important," *id.* at 728, we noted that Epps's lease was distinct from the tenant's lease in *Carter* as Epps's lease (as Kirk's lease did) provided for "automatic renewal" and could only be terminated for "good cause." *Id.* at 732. We further stated that, "[b]ecause Mr. Epps' lease continues for successive terms, his right to possession continues for an indefinite period, and thus, until termination for good cause, he is in possession under what at that point in time is an 'unexpired lease.'" (quoting *Cottman*, *supra*, 340 Md. at 298.) *Id.* at 733-734. Reiterating that, "in a project-based subsidized lease program, such as the New Construction Program, the lease term continues, rather than expires," *id.* at 735, we then affirmed the circuit court's grant of summary

15

judgment in Epps's favor, stating, in part: "Not only was Mr. Epps not a holdover tenant when the tenant holding over action was initiated, he does not reach holdover status until good cause has been established under the R.P. § 8-402.1 standard." *Id.* at 738.

In short, the decisions in *Carroll, Cottman,* and *Epps* compel us to conclude that it is well-established that, unless "good cause" exists to terminate Kirk's lease, her right to possess the premises continues indefinitely. Accordingly, the correct method of calculating the amount in controversy in this case, that is, the value of Kirk's right to possession of the leased premises, should be determined by multiplying the annual fair market rental payment by her remaining estimated life expectancy, a product which the parties agree exceeds the amount required for a jury trial.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEE.**